OPINION OF THE COURT
Chief Judge Wachtler.
Mary O’Connor is an elderly hospital patient who, as a result of several strokes, is mentally incompetent and unable to obtain food or drink without medical assistance. In this dispute between her daughters and the hospital the question is whether the hospital should be permitted to insert a nasogastric tube to provide her with sustenance or whether, instead, such medical intervention should be precluded and she should be allowed to die because, prior to becoming incompetent, she made several statements to the effect that she did not want to be a burden to anyone and would not want to live or be kept alive by artificial means if she were unable to care for herself.
The hospital has applied for court authorization to insert the nasogastric tube. The patient’s daughters object claiming that it is contrary to her "expressed wishes”, although they conceded at the hearing that they do not know whether their mother would want to decline this procedure under these circumstances, particularly if it would produce a painful death. The trial court denied the hospital’s application, concluding that it was contrary to the patient’s wishes. The Appellate Division affirmed, with two Justices dissenting. The hospital has appealed by leave of the Appellate Division which also granted a stay permitting the patient to be fed intravenously while this appeal is pending.
We have concluded that the order of the Appellate Division should be reversed and the hospital’s petition granted. On this record there is not clear and convincing proof that the patient had made a firm and settled commitment, while competent, to decline this type of medical assistance under circumstances such as these.[1]
*523 I.
The patient is a 77-year-old widow with two children, Helen and Joan, both of whom are practical nurses. After her husband’s death in 1967 she lived alone in her apartment in the New York City area where she was employed in hospital administration. In 1983 she retired from her job after 20 years service.
Over the years a number of her close relatives died of cancer. Her husband died of brain cancer. The last two of her nine brothers died of cancer, one in 1975 and the other in 1977. During their final years she regularly visited them in the hospital and cared for them when they were home. In November 1984, after being informed that her stepmother had died of cancer in Florida, Mrs. O’Connor had an attack of congestive heart failure and was hospitalized. She was released from the hospital in December 1984.
In July of the following year she suffered the first of a series of strokes causing brain damage and related disabilities which rendered her unable to care for herself. She became passive, could only carry on limited conversations, and could not walk, eat, dress or care for her bodily needs without assistance from others. Upon her release from the hospital in August 1985, Mrs. O’Connor resided with her daughter Helen who, together with Joan and another woman, provided her with full-time care.
In December 1987, Mrs. O’Connor had a second major stroke causing additional physical and mental disabilities. She became unresponsive and unable to stand or feed herself. She had to be spoon-fed by others. Her gag reflex was also impaired, as a result of which she experienced difficulty swallowing and thus could eat only pureed foods. In this condition her daughters found that they could no longer care for her at home and, when she left the hospital in February 1988, she was transferred to the Ruth Taylor Institute (the Institute), a long-term geriatric care facility associated with the Westchester County Medical Center (the hospital). In conjunction with this transfer, her daughters submitted a document signed by both of them, to be included in her medical file, stating that their mother had expressed the wish in many conversations that "no artificial life support be started or maintained in order to continue to sustain her life”, and that they wanted this request to be honored.
During the initial part of her stay at the Institute the staff *524 found Mrs. O’Connor was cooperative, capable of sitting in a chair and interacting with her surroundings. However, in June her condition deteriorated. She became "stuperous, virtually not responsive” and developed a fever. On June 20, 1988, she was transferred from the Institute to the hospital.
At the hospital it was determined that she was suffering from dehydration, sepsis and probably pneumonia. The hospital staff also found that she had lost her gag reflex, making it impossible for her to swallow food or liquids without medical assistance. She showed marked improvement after receiving fluids, limited nourishment and antibiotics intravenously. Within a few days she became alert, able to follow simple commands and respond verbally to simple questions. However her inability to swallow persisted and her physician, Dr. Sivak, determined that a nasogastric tube should be used to provide more substantial nourishment. When Mrs. O’Connor’s daughters objected to this procedure, the matter was brought before the hospital’s ethics committee which found that it would be inappropriate to withhold this treatment under the circumstances.
On July 15, the hospital commenced this proceeding by order to show cause seeking court authorization to use the nasogastric tube, claiming that without this relief Mrs. O’Con-nor would die of thirst and starvation within a few weeks. In an opposing affidavit her daughters stated that this was against their mother’s expressed wishes because before becoming incompetent, she had repeatedly stated that she did not want her life prolonged by artificial means if she was unable to care for herself. They noted the number of relatives she had comforted during prolonged final illnesses and urged that the effect of her statements should be evaluated against that background.
The hearing on the petition began on July 19 and concluded on July 21. Two medical experts testified regarding Mrs. O’Connor’s condition: Dr. Sivak for the hospital and Dr. Wasserman for the respondents. With respect to the patient’s statements concerning life-sustaining measures the respondents themselves both testified and called one additional witness, James Lampasso.
The treating physician, Dr. Sivak, testified that Mrs. O’Con-nor was suffering from multi-infarct dementia as a result of the strokes. This condition substantially impaired her cognitive ability but she was not in a coma or vegetative state. She *525 was conscious, and capable of responding to simple questions or requests sometimes by squeezing the questioner’s hand and sometimes verbally. She was also able to respond to noxious stimuli, such as a needle prick, and in fact was sensitive to "even minimal discomfort”, although she was not experiencing pain in her present condition. When asked how she felt she usually responded "fine”, "all right” or "ok”. The treating physician also testified that her mental awareness had improved at the hospital and that she might become more alert in the future. In fact during the latest examination conducted that morning, in response to the doctor’s request she had attempted to sit up and had been able to roll over on her side so that he could examine her lungs. However, Dr. Sivak stated that she is unable to comprehend complex questions, such as those dealing with her medical treatment, and doubted that she would ever regain significant mental capacity because the brain damage was substantial and irreparable.
The doctor stated that Mrs. O’Connor was presently receiving nourishment exclusively through intravenous feeding. However, this procedure was inadequate for long-term use because it does not provide sufficient nutrients and the veins tend to deteriorate. He testified that intravenous feeding is used as a temporary measure which generally must be discontinued within several weeks. He noted that these difficulties could be overcome with a gastric tube connected to the patient’s digestive tract through her nose or abdomen. This procedure would provide adequate nutrients and could cause only transient discomfort at the time of insertion. Since the patient’s condition is otherwise fairly stable, this procedure would preserve her life for several months, perhaps several years. If the procedure were not employed and the intravenous methods could no longer be used or were otherwise discontinued, she would die of thirst and starvation within 7 to 10 days. The doctor stated that death from starvation and especially thirst, was a painful way to die and that Mrs. O’Connor would, therefore, experience extreme, intense discomfort since she is conscious, alert, capable of feeling pain, and sensitive to even mild discomfort.
The respondents’ expert Dr. Wasserman, a neurologist, agreed essentially with Dr. Sivak’s evaluation and prognosis. In his opinion, however, Mrs. O’Connor would not experience pain if permitted to die of thirst and starvation. Because of the extensive brain damage she had suffered, the doctor did not "think she would react as you or I would under the *526 circumstances” but would simply become more lethargic, unresponsive and would ultimately die. If she experienced pain he believed she could be given pain killers to alleviate it. He conceded, however, that he could not be "medically certain” that she would not suffer because he had never had a patient, or heard of one, dying after being deprived of food and water. Thus he candidly admitted: "I guess we don’t know”.
Interestingly, Dr. Wasserman also admitted that during his examination, which occurred just before the close of the hearing, the patient exhibited further improvement in her condition. He found that she was generally able to respond to simple commands, such as a request to move her arm or foot. He also noted that she was able to state her name, seemed to be aware of where she was, and responded to questions about 50 or 60% of the time, although her speech was slow and halting and her responses were not always appropriate. Most significantly, she was able to converse in short sentences of two or three words which, he noted, she had not been able to do since her admission to the hospital. He also observed that she had a gag reflex. Although he did not know whether Mrs. O’Connor would be able to use it to eat, he recognized the possibility that she might.
Neither of the doctors had known Mrs. O’Connor before she became incompetent and thus knew nothing of her attitudes toward the use of life-sustaining measures. The respondents’ first witness on this point was James Lampasso, a former coworker and longtime friend of Mrs. O’Connor. He was also acquainted with other members of the family and presently worked with the patient’s daughter Helen at a local hospital. He testified that his first discussion with Mrs. O’Connor concerning artificial means of prolonging life occurred about 1969. At that time his father, who was dying of cancer, informed him that he would not want to continue life by any artificial method if he had lost his dignity because he could no longer control his normal bodily functions. The witness said that when he told Mrs. O’Connor of this she agreed wholeheartedly and said: "I would never want to be a burden on anyone and I would never want to lose my dignity before I passed away.” He noted that she was a "very religious woman” who "felt that nature should take its course and not use further artificial means.” They had similar conversations on two or three occasions between 1969 and 1973. During these discussions Mrs. O’Connor variously stated that it is "monstrous” to keep someone alive by using "machinery, *527 things like that” when they are "not going to get better”; that she would never want to be in the same situation as her husband and Mr. Lampasso’s father and that people who are "suffering very badly” should be allowed to die.
Mrs. O’Connor’s daughter Helen testified that her mother informed her on several occasions that if she became ill and was unable to care for herself she would not want her life to be sustained artificially. The first discussion occurred after her husband was hospitalized with cancer in 1967. At that time Mrs. O’Connor said that she never wanted to be in a similar situation and that she would not want to go on living if she could not "take care of herself and make her own decisions.” The last discussion occurred after Mrs. O’Connor’s stepmother died of cancer and Mrs. O’Connor was hospitalized for a heart attack: "My mother said that she was very glad to be home, very glad to be out of the hospital and hope[d] she would never have to be back in one again and would never want any sort of intervention any sort of life support systems to maintain or prolong her life.” Mrs. O’Connor’s other daughter, Joan, essentially adopted her sister’s testimony. She described her mother’s statements on this subject as less solemn pronouncements: "it was brought up when we were together, at times when in conversations you start something, you know, maybe the news was on and maybe that was the topic that was brought up and that’s how it came about.”
However, all three of these witnesses also agreed that Mrs. O’Connor had never discussed providing food or water with medical assistance, nor had she ever said that she would adhere to her view and decline medical treatment "by artificial means” if that would produce a painful death. When Helen was asked what choice her mother would make under those circumstances she admitted that she did not know. Her sister Joan agreed, noting that this had never been discussed, "unfortunately, no”.
At the conclusion of the hearing the daughters submitted a counterclaim seeking an order directing the hospital to also discontinue the intravenous feeding.
As noted the trial court denied the hospital’s petition and granted the counterclaim concluding that Mrs. O’Connor’s "past expressions plainly covered any form of life-prolonging treatment”. The Appellate Division affirmed noting that requiring greater specificity would impose an undue burden on those seeking to avoid life-prolonging treatment.
*528 II.
It has long been the common-law rule in this State that a person has the right to decline medical treatment, even lifesaving treatment, absent an overriding State interest (Schloendorff v Society of N. Y Hosp., 211 NY 125, 129-130). In 1981, we held, in two companion cases, that a hospital or medical facility must respect this right even when a patient becomes incompetent, if while competent, the patient stated that he or she did not want certain procedures to be employed under specified circumstances (Matter of Storar and Matter of Eichner v Dillon, 52 NY2d 363). In Storar, involving a retarded adult suffering from terminal cancer, who needed blood transfusions to keep him from bleeding to death, we declined to direct termination of the treatment because it was impossible to determine what his wish would have been were he competent and it would be improper for a court to substitute its judgment for the unascertainable wish of the patient. Commenting on this latter principle in a subsequent case we noted that the right to decline treatment is personal and, under existing law in this State, could not be exercised by a third party when the patient is unable to do so (People v Eulo, 63 NY2d 341).[2]
In contrast to the patient in Storar, the patient in Eichner *529 had been competent and capable of expressing his will before he was silenced by illness. In those circumstances, we concluded that it would be appropriate for the court to intervene and direct the termination of artificial life supports, in accordance with the patient’s wishes, because it was established by "clear and convincing evidence” that the patient would have so directed if he were competent and able to communicate (52 NY2d, at 379, supra; see also, Matter of Delio v Westchester County Med. Center, 129 AD2d 1; Addington v Texas, 441 US 418, 424). We selected the "clear and convincing evidence” standard in Eichner because it " 'impresses] the factfinder with the importance of the decision’ * * * and it 'forbids relief whenever the evidence is loose, equivocal or contradictory’ ” (Matter of Storar, supra, at 379). Nothing less than unequivocal proof will suffice when the decision to terminate life supports is at issue.[3]
In Eichner, we had no difficulty finding "clear and convincing” evidence of the patient’s wishes. Brother Fox, the patient in Eichner, was a member of a religious order who had conscientiously discussed his moral and personal views concerning the use of a respirator on persons in a vegetative state. The conclusion that "he carefully reflected on the subject * * * [was] supported by his religious beliefs and [was] not inconsistent with his life of unselfish religious devotion.” (Id., at 379-380.) Further, his expressions were "solemn pronouncements and not casual remarks made at some social gathering, nor c[ould] it be said that he was too young to realize or feel the consequences of his statements” (id., at 380). Indeed, because the facts in Brother Fox’s case were so clear, we had no need to elaborate upon the kind of showing necessary to satisfy the "clear and convincing” standard.
The facts in this case present a much closer question and require us to explore in more detail the application of that standard in this context. It would, of course, be unrealistic for us to attempt to establish a rigid set of guidelines to be used in all cases requiring an evaluation of a now-incompetent patient’s previously expressed wishes. The number and variety of situations in which the problem of terminating artificial life supports arises preclude any attempt to anticipate all of the *530 possible permutations. However, this case, as well as our prior decisions, suggest some basic principles which may be used in determining whether the proof "clearly and convincingly” evinces an intention by the patient to reject life prolonged artificially by medical means.
III.
At the outset, since the inquiry in New York is limited to ascertaining and then effectuating the patient’s expressed wishes, our focus must always be on what the patient would say if asked today whether the treatment in issue should be terminated. However, we can never be completely certain of the answer to our question, since the inquiry assumes that the patient is no longer able to express his or her wishes. Most often, therefore, the inquiry turns on interpretation of statements on the subject made by the patient in the past. This exercise presents inherent problems.
For example, there always exists the possibility that, despite his or her clear expressions in the past, the patient has since changed his or her mind. And, as Judge Simons in his dissenting opinion correctly points out, human beings are incapable of perfect foresight. Thus, almost inevitably, the medical circumstances in the mind of the patient at the time the statements were made will not coincide perfectly with those which give rise to the need for the inquiry. In addition, there exists the danger that the statements were made without the reflection and resolve that would be brought to bear on the issue if the patient were presently capable of making the decision.
But the existence of these problems does not lead inevitably to the conclusion that we should abandon the inquiry entirely and adopt as guideposts the objective factors used in the so-called "substituted judgment” approach (see, Brophy v New England Sinai Hosp., 398 Mass 417, 429-440, 497 NE2d 626). That approach remains unacceptable because it is inconsistent with our fundamental commitment to the notion that no person or court should substitute its judgment as to what would be an acceptable quality of life for another (People v Eulo, supra, at 357). Consequently, we adhere to the view that, despite its pitfalls and inevitable uncertainties, the inquiry must always be narrowed to the patient’s expressed intent, with every effort made to minimize the opportunity for error.
Every person has a right to life, and no one should be *531 denied essential medical care unless the evidence clearly and convincingly shows that the patient intended to decline the treatment under some particular circumstances (Matter of Storar, supra, at 379). This is a demanding standard, the most rigorous burden of proof in civil cases (id.). It is appropriate here because if an error occurs it should be made on the side of life.
Viewed in that light, the "clear and convincing” evidence standard requires proof sufficient to persuade the trier of fact that the patient held a firm and settled commitment to the termination of life supports under the circumstances like those presented. As a threshold matter, the trier of fact must be convinced, as far as is humanly possible, that the strength of the individual’s beliefs and the durability of the individual’s commitment to those beliefs (see, Matter of Eichner, supra, at 380) makes a recent change of heart unlikely. The persistence of the individual’s statements, the seriousness with which those statements were made and the inferences, if any, that may be drawn from the surrounding circumstances are among the factors which should be considered.
The ideal situation is one in which the patient’s wishes were expressed in some form of a writing, perhaps a "living will,” while he or she was still competent. The existence of a writing suggests the author’s seriousness of purpose and ensures that the court is not being asked to make a life-or-death decision based upon casual remarks. Further, a person who has troubled to set forth his or her wishes in a writing is more likely than one who has not to make sure that any subsequent changes of heart are adequately expressed, either in a new writing or through clear statements to relatives and friends. In contrast, a person whose expressions of intention were limited to oral statements may not as fully appreciate the need to "rescind” those statements after a change of heart.[4]
Of course, a requirement of a written expression in every *532 case would be unrealistic. Further, it would unfairly penalize those who lack the skills to place their feelings in writing. For that reason, we must always remain open to applications such as this, which are based upon the repeated oral expressions of the patient. In this case, however, the application must ultimately fail, because it does not meet the foregoing criteria.
Although Mrs. O’Connor’s statements about her desire to decline life-saving treatments were repeated over a number of years, there is nothing, other than speculation, to persuade the fact finder that her expressions were more than immediate reactions to the unsettling experience of seeing or hearing of another’s unnecessarily prolonged death. Her comments— that she would never want to lose her dignity before she passed away, that nature should be permitted to take its course, that it is "monstrous” to use life-support machinery— are, in fact, no different than those that many of us might make after witnessing an agonizing death. Similarly, her statements to the effect that she would not want to be a burden to anyone are the type of statements that older people frequently, almost invariably make. If such statements were routinely held to be clear and convincing proof of a general intent to decline all medical treatment once incompetency sets in, few nursing home patients would ever receive life-sustaining medical treatment in the future. The aged and infirm would be placed at grave risk if the law uniformly but unrealistically treated the expression of such sentiments as a calm and deliberate resolve to decline all life-sustaining medical assistance once the speaker is silenced by mental disability. That Mrs. O’Connor made similar statements over a long period of time, does not, by itself, transform them from the type of comments that are often made casually into the type of statements that demonstrate a seriousness of purpose necessary to satisfy the "clear and convincing evidence” standard.
We do not mean to suggest that, to be effective, a patient’s expressed desire to decline treatment must specify a precise condition and a particular treatment. We recognize that human beings are not capable of foreseeing either their own *533 medical condition or advances in medical technology. Nevertheless, it is relevant to the fundamental question — the patient’s desires — to consider whether the infirmities she was concerned with and the procedures she eschewed are qualitatively different than those now presented. Not that the exact nature of her condition would be dispositive in this analysis— it is but another element to be considered in the context of determining whether her pronouncement made on some previous occasion bears relevance to her present condition.
Thus, it is appropriate for us to consider the circumstances in which Mrs. O’Connor made the statements and to compare them with those which presently prevail.
Her statements with respect to declining artificial means of life support were generally prompted by her experience with persons suffering terminal illnesses, particularly cancer. However, Mrs. O’Connor does not have a terminal illness, except in the sense that she is aged and infirm. Neither is she in a coma nor vegetative state. She is awake and conscious; she can feel pain, responds to simple commands, can carry on limited conversations, and is not experiencing any pain. She is simply an elderly person who as a result of several strokes suffers certain disabilities, including an inability to feed herself or eat in a normal manner. She is in a stable condition and if properly nourished will remain in that condition unless some other medical problem arises. Because of her age and general physical condition, her life expectancy is not great. But that is true of many nursing home patients. The key thing that sets her apart — though there are likely thousands like her — is her inability to eat or obtain nourishment without medical assistance.
It is true, of course, that in her present condition she cannot care for herself or survive without medical assistance and that she has stated that she never wanted to be a burden and would not want to live, or be kept alive "artificially” if she could not care for herself. But no one contends, and it should not be assumed, that she contemplated declining medical assistance when her prognosis was uncertain. Here both medical experts agreed that she will never regain sufficient mental ability to care for herself, but it is not clear from the record that the loss of her gag reflex is permanent and that she will never be able to obtain food and drink without medical assistance.
The record also shows that throughout her life Mrs. O’Con- *534 nor was an independent woman who found it distasteful to be dependent on others. Unfortunately, she has been unable to care for herself for several years. As a result of her first stroke in July 1985, she has required full-time care, and following her latest stroke in December of 1987, she had to be spoon-fed until her gag reflex completely failed in June of this year. No one contends that the assistance she received up to that point violated her wishes, although there is little question that she would not have survived without this constant attention from others, including some medical professionals. The only change in her condition is the loss of her gag reflex, and the consequent need for medical assistance in eating, which is said to be contrary to her desires.
In sum, on this record it cannot be said that Mrs. O’Connor elected to die under circumstances such as these. Even her daughters, who undoubtedly know her wishes better than anyone, are earnestly trying to carry them out, and whose motives we believe to be of the highest and most loving kind, candidly admit that they do not know what she would do, or what she would want done under these circumstances.[5]
Accordingly the order of the Appellate Division should be *535 reversed, the petition granted and counterclaim dismissed, without costs.

. On this analysis it is unnecessary to reach the many other issues presented on this appeal including the question as to State interest in prolonging life particularly in view of the fact that that issue is not asserted by the parties.

. The status of the law on this point has since been changed to some extent by legislation. The Legislature has now authorized third parties to issue do not resuscitate orders for incompetent patients under certain circumstances (Public Health Law art 29-b). More recently the Legislature enacted a statute permitting individuals to create "springing powers of attorney”, which come into effect when another designated person determines that the maker has become incompetent (General Obligations Law § 5-1602). This broadens the "durable power of attorney” which simply survives incompetency (General Obligations Law § 5-1601). Although powers of attorney have traditionally been limited to delegation of financial powers as opposed to personal decisions (see, e.g., Camardella v Schwartz, 126 App Div 334, 337; Restatement [Second] of Agency § 17), this limitation has been eroded by court recognition of the ability of third parties to express the wishes of incompetent patients without written authority (see, 1984 Opns Atty Gen 58, No. 84-F16). There is therefore no longer any reason in principle why those wishing to appoint another to express their specific or general desires with respect to medical treatment, in the event they become incompetent, may not do so formally through a power of attorney. The question raised by the dissent with respect to pure substituted judgment exercised by a third party not designated by the patient is not at issue in this case since Mrs. O’Connor’s daughters made it very clear at the hearing that they were simply conveying their mother’s wishes, and were not attempting to decide for her. There has been no change in the law which would confer such a power on the courts or others.

. Whether there is sufficient evidence in the record to satisfy the clear and convincing standard presents a question of law reviewable by this court. Reviewing the entire record in this manner does not involve making new factual findings, as the dissent suggests.

. There are numerous instances in which the law refuses to recognize the exercise or waiver of an important right unless the intent to do so is clearly manifested. Waivers of constitutional rights are always carefully scrutinized by the courts and, indeed, waivers of some constitutional rights will be given no effect unless, in addition, the individual has been advised of the right and consequences of waiver, or has made the waiver in open court or has had the assistance of counsel actually present. It is also familiar law, even to most laymen, that the right to dispose of real property will not be legally effective unless the intent to do so is made in writing with a high degree of specificity. Indeed, no one’s request to have real or personal property pass to a specified person upon death can be enforced in court, no *532 matter how clear and unequivocal the intent may be, unless it is also expressly stated in a signed will, witnessed by others. Although one may argue whether such demanding, and sometimes formal requirements, should come initially from the Legislature, it cannot be seriously urged that it would be "unrealistic” for the law to accord the same protections to the individual’s life and right to survive, as have long been accorded to the individual’s land and pocketbook.

. The suggestion in Judge Simon’s dissent (dissenting opn, at 549) that our decision today presents an ironic contrast to our holding in Rivers v Katz (67 NY2d 485) misconstrues the rule announced in that case as well as the basis for our decision in the case now before us.
In Katz we simply held that commitment to a mental institution does not necessarily show that a person lacks the mental capacity to make any mental health choices. Thus a mental patient’s refusal to consent to a particular treatment should generally be honored unless it is proven that the person’s mental disability does in fact impair the ability to make such a choice. There was no question in that case as to what treatments the patients intended to decline; the only question was whether they had sufficient mental capacity to make the choice.
The converse is true here. There is no question that Mrs. O’Connor was competent when she made the statements in issue and the only question is whether she intended by those statements to choose death by starvation and thirst in her present circumstances. Thus we are not holding that "an incompetent patient cannot forego the use of artificial life-sustaining machines offering no hope of improvement or cure.” (Dissenting opn, at 549.) Indeed such a holding would be inconsistent with our decision in Matter of Eichner (52 NY2d 363) where as noted, the wishes of such a patient were upheld by this court upon clear and convincing evidence that the patient intended to decline the treatment under the circumstances. Our present decision simply demonstrates that the Eichner standard is a meaningful one, and that no one should be denied life-sustaining treatment when there is not clear and convincing evidence that this was in fact the patient’s choice. In short it is unfair and inaccurate to suggest that mental patients have greater rights of "self-determination” than other patients. In fact, we *535 noted in Katz that their wishes to decline a particular treatment for mental illness should not be honored if that would endanger their lives or the lives of others (Rivers v Katz, supra, at 495).