## Ragona v. Preate

*Terrence R. Nealon,* for plaintiff.

*Ernest D. Preate, attorney general,* for the commonwealth.

*Linda C. Barrett* and *Louis J. Rovelli, deputy attorneys general,* for the commonwealth.

*Lawrence M. Ludwig,* for defendant Moses Taylor Hospital.

*Paul J. Walker,* ad litem.

*Michael Barrasse* and *William H. Dunstone,* for Michael Barrasee.

MUNLEY, *J.,* November 30, 1990 — Before the court is guardian Joseph Ragona's action in declaratory judgment, pursuant to the Declaratory Judgments Act, 42 Pa.C.S. §§7531-7541, seeking authorization for the removal of a nasogastric feeding tube from his incompetent wife, Ruth Ragona. Ruth Ragona is a 64-year-old patient in a persistent

vegetative state with no hope of recovery. Petitioner requests that the court recognize Mrs. Ragona's constitutional and common-law right to refuse life-sustaining nutrition by artificial means.

Embarking on this task, we are mindful that Ruth Ragona's right to self-determination is our guiding principle; the court does not decide whether to withdraw the life-supporting treatment, rather our role is to determine and effectuate Ruth Ragona's express intent. *In re Jobes,* 108 N.J. 394, 529 A.2d 434 (1987). In order to effectuate the wishes of Ruth Ragona, an incompetent individual who has not generated a written document containing those wishes, this court must rely upon relevant oral statements made by Ruth Ragona when she was competent. The petitioner must prove the manifestation of Ruth Ragona's intent by clear and convincing evidence. *Cruzan v. Director, Missouri Department of Health,* __ U.S. __, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Further, this court can only decide what is before it. It will decide on legal principles alone. This court must not manage morality or temper theology. Its charge is to examine what law there is and apply it to the facts proven in this cause.

In the absence of legislation,[1] the court must decide this case under the existing applicable case law, keeping in mind this is a unique case of first impression in this state. This court in suggesting that there is no law applicable in Pennsylvania will take care not to misallocate rights and obligations or create interpretations where none were intended. Though it is evident that the issues in this case are unique to Pennsylvania courts, they have been dealt

---

1. Living will legislation is currently under consideration in Pennsylvania (e.g. Senate Bill no. 646, printer's no. 2533).

with regularly by the courts of New Jersey, New York and other states in contexts which, if not identical, present the same questions dealt with here.

Although there is no Pennsylvania case law which has addressed this particular question under identical factual circumstances, nonetheless, there are Pennsylvania rulings which have discussed a competent individual's right to discontinue life-sustaining systems.

The first reported case in Pennsylvania, *In re Jane Doe,* 45 D.&C. 3d 371 (1987), involved a request by an adult woman suffering from amyotrophic lateral sclerosis (Lou Gehrig's Disease) to remove her life-sustaining support systems. After the hospital indicated that it was willing to accede to the patient's wishes provided she obtained an appropriate court order, the patient brought an action for declaratory judgment.

Not unlike the Ragona case, Judge Lehrer observed in *Jane Doe* that there was no controlling precedent in Pennsylvania upon which he could rely in making his decision. After remarking that the state legislature had not yet adopted a legislative proposal concerning the issue, the *Doe* court reasoned that this inaction required immediate judicial intervention and stated:

"Scientific advancements have prolonged life in many instances, while doing nothing to sustain the quality of that life. This fact, which is common knowledge, has raised legal issues and given need for legal intervention. Legislatures are often slow to act, and where the legislature has failed to act, the courts must respond to protect individual rights." *Id.* at 371.

In resolving this difficult question, the *Doe* court stated: "First, the case law is clear that the right of

a competent individual to refuse medical care or to have it withdrawn is a right under the common law doctrine of self-determination and a constitutional right of privacy." *Id.* at 381.

The *Doe* decision is relevant to the matter sub judice to the extent that: (1) it recognizes a common-law right to self-determination based upon Pennsylvania law concerning informed consent; (2) it acknowledges a constitutional right to refuse unwanted medical treatment and life-sustaining procedures under both the U.S. and Pennsylvania constitutions commonly referred to as "right-to-die" issues; and (3) it establishes that the court must create case law governing these "right-to-die" issues in those situations where the legislature has not spoken.

Earlier this year, the Court of Common Pleas of Philadelphia County revisited the same issue decided in *Doe*. In *Neuman Medical Center Inc. v. Popowich, D.O.,* no. 5663 January term, 1990, Neuman Medical Center filed a petition for emergency declaratory relief and expedited hearing seeking to discontinue the life-support systems maintaining Thelma Stussy, a victim of Lou Gehrig's Disease. Since Ms. Stussy was conscious and apparently capable of communicating only by way of blinking her eyes, the trial judge and counsel were forced to question the patient personally to determine her wishes with reference to the life support. See *The Philadelphia Inquirer* (April 26, 1990, ed.), at 1-A, 17-A. On the same day that this hearing was conducted, Judge Nicholas M. D'Alessandro entered an order authorizing Neuman Medical Center to comply with Thelma Stussy's request to discontinue her mechanical ventilator, without incurring any civil or criminal liability. *Neuman Medical Center Inc. v. Popowich, D.O., supra.*

More recently, in *Commonwealth, Department of Public Welfare v. Kallinger,* ___ Pa. Commw. ___, 580 A.2d 887 (1990), a convicted murderer committed to a mental hospital for the criminally insane refused to accept nutrition and other medical treatment. His custodian, the Department of Public Welfare, sought court permission to force Kallinger to involuntarily receive food through a nasogastric tube. Although the trial court originally entered a preliminary order permitting DPW to do so, it later dissolved its preliminary order and determined that Kallinger could reject nutrition and hydration necessary to preserve his life.

The appellate court acknowledged that the Kallinger matter was "not a 'right-to-die' case in the usual sense," since Kallinger, as a convict in a prison setting, did not enjoy the same unfettered constitutional rights as a free person (i.e., such as Ruth Ragona).

There is a plethora of precedent from other jurisdictions concerning the specific issue in this case and these courts have varied in the degree of specificity required before being guided by the prior expressed wishes of the patient. New York's highest court, in *In re O'Connor,* 72 N.Y. 2d 517, 531 N.E.2d 607, 534 N.Y.S. 2d 886 (Ct. App. 1988, amended 1989), required a relatively high degree of specificity (e.g. "expressions were more than immediate reactions to the unsettling experience of seeing or hearing of another's unnecessarily prolonged death." 72 N.Y.2d at 532, 531 N.E.2d at 614). "Clear and convincing evidence" of a firm, settled decision was needed, and casual remarks, even if made repeatedly, were not sufficient. Furthermore, the statements had to be directly relevant to the patient's current condition and the proposed treatment. In contrast, New Jersey's highest court, in *In*

*re Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985), required less specificity regarding the patient's wishes (e.g., "It might take the form of reactions that the patient voiced regarding medical treatment administered to others." 486 A.2d at 1230). Indeed, where the wishes of the patient could not be directly established, the court required only that there be "some · trustworthy evidence" of the patient's wishes, including "[e]vidence that, taken as a whole, would be too vague, casual, or remote" to provide direct evidence of the patient's wishes.

Of course the recent holding of the U.S. Supreme Court in *Cruzan, supra* upheld Missouri's use of the clear and convincing evidence standard to establish a patient's previously expressed wishes. In that case, Nancy Cruzan's parents sought a court order directing the withdrawal of their daughter's artificial feeding and hydration equipment after she had digressed into a persistent vegetative state. Missouri law provided that such life-sustaining measures could be discontinued only if the petitioner demonstrated the incompetent's express wishes as to the withdrawal of such treatment by "clear and convincing evidence." After analyzing the state interests at stake, the "Supreme Court of Missouri held that because there was no clear and convincing evidence of Nancy's desire to have life-sustaining treatment withdrawn under such circumstances, her parents lacked authority to effectuate such a request." *Cruzan, supra,* 110 S.Ct. at 2845.

In *Cruzan,* the only testimony produced by the petitioner consisted of the incompetent's general statements made to a housemate that she would not want to live should she face life as a "vegetable." *Id.* at 2855. In critiquing the paucity of relevant testimony furnished by the *Cruzan* petitioner, the U.S. Supreme Court distinctly stated that "[t]he observa-

tions did not deal in terms with withdrawal of medical treatment or of hydration and nutrition." *Id.*

In short, the *Cruzan* court concluded that a state is free to adopt a standard of proof in these proceedings which requires clear and convincing evidence of the incompetent's express wishes, although a state is equally at liberty to formulate less stringent standards. For purposes of the *Ragona* proceedings, the *Cruzan* holding is most helpful for its analysis of a patient's common-law and constitutional rights to self-determination. In discussing a person's common-law right to refuse unwanted medical treatment, the *Cruzan* court remarked:

"Before the turn of the century, this court observed that '[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. . . . Every human being of adult years and sound mind has a right to determine what shall be done with his own body;. . ." *Id.* at 2846-7. (citation omitted)

After reviewing case law addressing the principle of informed consent, the *Cruzan* majority determined that "[t]he legal corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment." *Id.* at 2847.

The *Cruzan* court reasoned that a person has a constitutionally protected liberty interest in refusing unwanted medical treatment. *Id.* at 2851. Based upon its analysis of its earlier rulings, the United States Supreme Court concluded that a person has a "liberty interest" under the due process clause of the 14th Amendment of the United States Constitution which grants a person "a constitutionally

protected right to refuse lifesaving hydration and nutrition." *Id.* at 2851-2.

This court, in the matter sub judice, conducted an evidentiary hearing on November 5, 1990 wherein the court was confronted with the following circumstances: Ruth Ragona has been hospitalized at the Moses Taylor Hospital since February 8, 1990 as the result of a massive stroke that has left her paralyzed. Mrs. Ragona is currently receiving nutrition solely through a nasogastric feeding tube.[2] It is important to note that artificial nutrition and hydration is a form of medical treatment; in general, its use or discontinuation is governed by the same principles and practices that govern all forms of life-sustaining medical treatment.[3] *Cruzan, supra; In re Guardianship of Browning v. Herbert,* 59 U.S.L.W. 2191, n.6 (Fla. Supreme Court, September 13, 1990); *In re Estate of Longeway,* 133 Ill. 2d 33, 42, 139 Ill. Dec. 780, 784, 549 N.E.2d 292, 296 (1989); *In re Conroy, supra.* In the disposition of this matter, life-sustaining treatments, in and of themselves, do not have inherent legal significance and terms such as "extraordinary," "ordinary" and "heroic" measures are of little value in making a life-sustaining treatment decision.

---

2.  The nasogastric feeding tube is a modality of medical treatment, it will neither arrest the underlying disease's deterioration nor impede its process.

3.  "The artificial provision of nutrition and hydration is a form of medical treatment ... analogous to other forms of life-sustaining treatment, such as the use of the respirator. When a patient is unconscious, both a respirator and an artificial feeding device serve to support or replace normal bodily functions that are compromised as a result of the patient's illness." Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient, 39 Neurology 125 (January 1989).

This court is concerned with two factual issues: (1) is Ruth Ragona in an irreversible, persistent vegetative state with absolutely no possibility of improvement? and (2) did Ruth Ragona express any previous intent concerning the use or non-use of artificial feeding tubes?

Historically, Ruth Ragona suffered an initial stroke in October 1984 and was hospitalized at Moses Taylor Hospital. Through rehabilitation Mrs. Ragona gradually regained her ability to speak, but remained confined to a wheelchair due to partial paralysis on the right side of her body. On February 8, 1990, Mrs. Ragona suffered another stroke and was transported to Moses Taylor Hospital. On February 27, 1990, she was transferred to the Moses Taylor Skilled Nursing Facility where she remains hospitalized today. Mayur C. Maniar, M.D., a board-certified neurologist, diagnosed her condition on February 9, 1990 as: (1) a brain stem infarct resulting in a comatose state; (2) right focal motor seizure disorder secondary to her left hemispheric infarct; and (3) status post left frontal lobe infarct with residual spastic right hemiparesis; (4) prognosis is "grave." (T.R. 16, 17; plaintiff's exhibit 2.) Following this evaluation by Dr. Maniar, Mrs. Ragona came under the primary care of Vithalbhai D. Dhaduk, M.D., a board-certified neurologist. Dr. Dhaduk's clinical diagnosis of Mrs. Ragona's condition has been: (1) permanent, persistent vegetative state[4] secondary to cerebral vascular strokes in both

_____

4. "Vegetative state describes a body which is functioning entirely in terms of its internal controls. It maintains temperature. It maintains heartbeat and pulmonary ventilation. It maintains digestive activity. It maintains reflex activity of muscles and nerves for low-level condition responses. But there is no behavioral evidence of either self-awareness or awareness of the surroundings in a learned manner." *Cruzan* at 2845 n.1; *In re Jobes* at 438.

hemispheres of the brain; (2) seizure disorder secondary to the stroke in the left hemisphere; and (3) septicemia. (T.R. 32.) Dr. Dhaduk's conclusion that Mrs. Ragona is in an irreversible persistent vegetative state was based upon his treatment and evaluation of Ruth Ragona over the past nine months, coupled with the test results of the computer tomographic maze (CAT scan) and electroencephalogram (EEG). (T.R. 42, 71.) Dr. Dhaduk testified that Mrs. Ragona will never be able to appreciate or experience anything other than pain. (T.R. 42, 43.)

In order to maximize the reliability of the medical evidence presented to this court via the treating physician, Dr. Dhaduk, the court heard the testimony of an independent medical expert, Charles T. Newton, M.D., a board-certified neurologist. Based upon his review of the hospital records, SNF reports, CAT scans, EEGs, as well as his physical examination of Mrs. Ragona, Dr. Newton opined that Ruth Ragona is in an irreversible persistent vegetative state. (T.R. 176, 177, 185, 194, 195.) Further, Dr. Newton acquiesces with Dr. Dhaduk's assessment that Mrs. Ragona is able to feel some form of pain, although she has no recognition or awareness of it. (T.R. 35, 47, 48, 183, 184, 191, 194.)

Finally, Mrs. Ragona has been examined by a fourth board-certified neurologist, Homayoon Froozan, M.D. Dr. Froozan agrees that Mrs. Ragona is in an irreversible persistent vegetative state with absolutely "no likelihood of recovery of function." (Plaintiff's exhibit 12.)

Thus four neurologists have examined Mrs. Ragona and arrived at the same medical prognosis: that Mrs. Ragona is in a persistent vegetative state, her condition is irreversible and there is no possi-

bility she will ever improve. (November 20, 1990 — T.R. 44.) We are satisfied with the credible medical testimony presented by the neurologists appearing before this court in conjunction with the specialist's medical reports which were also made available to the court. (Plaintiff's exhibits 2, 3, 4, 5, 6, 7, 8, 9.) We submit the physician's prognosis that Ruth Ragona is in a persistent vegetative state with no prospect of recovery has been proven by clear and convincing evidence.[5]

At this point, the opinion would have to turn to the question of the expressed intentions of Ruth Ragona. This question of expressed intent is dependent on the factual record established during the evidentiary hearing which focused on the testimony of individuals who were privy to relevant statements made by Ruth Ragona at a time when she had the requisite capacity. During the hearing Ruth Ragona's husband of 43 years, Joseph, and her son Robert, 22 years old, testified at length with regard to her prior expressed wishes concerning the use of life support and artificial feeding tubes.

We are persuaded by the evidence of Ruth Ragona's statements and conduct over a six-year span. First, we recognize Ruth Ragona's conduct in dealing with her own mother's illness as evidence, in and of itself, of her expressed intentions. In April 1984, Mrs. Ragona refused life-support for her mother who was in a "vegetative state." (T.R. 92, 93, 94, 95, 121.) Further, the serious conversations with her son Robert that followed this incident

---

5. "Clear and convincing evidence is that which produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy of the truth of the precise facts in issue." *In re Jobes* at 441.

clearly suggest that, given her present condition, she herself would not wish to continue in a "vegetative state." Robert testified, "that she [his mother] stated, if she was ever in such a situation as her mother was in, she would want nothing to prolong or sustain her life. She would want nature to take its course." (T.R. 93.)

Also in 1984, after she suffered her first stroke, Mrs. Ragona again made statements to her family regarding her desire to live or die under certain circumstances. During rehabilitation Mrs. Ragona was exposed to other patients who were in a "vegetative state," some with feeding tubes, and her reaction, according to the testimony, was always, "I don't ever want to be like that. I never want that done to me." She repeated these statements several times to her son and husband. (T.R. 96, 97, 116, 122, 123, 133, 135, 152.)

Of important distinction is the conversation Robert had with his mother in November 1986. We make special note of this particular conversation because of the absence of any emotional circumstances surrounding it. Robert and his mother were having a discussion about "death and wills and stuff." (T.R. 97, 98.) Robert asked, "If something should ever happen to you, what should we do?" Mrs. Ragona responded, "You know I don't want to be kept on anything that would keep me alive." (T.R. 97, 98.)

Finally, Robert testified that in the fall of 1988 his cousin Frank Sedlisky, who was dying from stomach cancer, had a major heart attack and the hospital attendants resuscitated him. (T.R. 99.) Robert stated, "his mother could not understand why if the poor man was dying . . . why would they bring him back to life? Why wouldn't they just let him go." (T.R. 100.) In addition Mrs. Ragona had

numerous conversations with Frank's wife Veronica during this time period, which prompted her to make comments to her son and husband distinctly and specifically with reference to artificial feeding tubes. According to the testimony, she stated, "Never put those things in me." (T.R. 100, 135, 136.) Mrs. Ragona's son Robert further testified that his mother had said, "she could not understand why we would want to build up someone who was in that shape with this food and this water when they were only going to be in pain and suffer and waste away the way Frank was. And she absolutely unequivocally stated she did not want that done to her." (T.R. 100.) "She more or less reinforced her comments that under no circumstances she wanted to have those tubes put in her like Frank had to have, to have her death prolonged like his was." (T.R. 101.)

We feel reference must also be made to the brochure the Ragonas received from the American Association of Retired Persons in the winter of 1989 containing articles on the *Cruzan* case and living wills. (T.R. 103.) This newsletter prompted conversation between Ruth Ragona and her husband regarding living wills. Mrs. Ragona expressed a desire to secure a living will and responded to the advertisement. (T.R. 140, 141.) Although this document was never received and ultimately executed, the interest and intent to secure a living will bears directly upon Mrs. Ragona's resolve to refuse life-sustaining treatment.

This court has carefully listened to, noted and reviewed the testimony of prominent medical specialists and persons most directly and intimately involved with the life of Ruth Ragona, her husband and son. The credibility of these witnesses has been examined, tested and weighed and in our judgment

found to be highly persuasive. This record demonstrates a course of conduct and credible statements over a span of six years, prompted by different circumstances, consistent with Mrs. Ragona's expressed intent to refuse life-sustaining treatment. The court finds this testimony to be clear and convincing evidence of an expressed intent to refuse medical treatment and this court will use its authority to accomplish those expressed intentions. In making this decision, the court is mindful that we are dealing in an area of constitutionally protected rights. We recognize the right to refuse treatment embodied in the common-law doctrine of informed consent, a broad right to privacy that supports an unrestricted right to refuse treatment under Article I, section 9 of the Pennsylvania Constitution, and finally, a liberty interest under the due process clause of the 14th Amendment of the United States Constitution.

We believe that there is nothing inherently improper in the use of advanced medical technology. The "right-to-die" cases in the context outlined here reflect on the advances in medical technology providing life-supporting systems as well as the limits of medicine when faced with the temporality of human existence. However, we submit a decision to refuse advanced medical technology is a constitutionally protected right that can only be abridged by a compelling state interest. The Attorney General, the chief law officer of the commonwealth, was named as a party to this action in order to represent the state's interest in the preservation of life, the prevention of suicide, the protection of innocent third parties and the integrity of the medical profession. *In re Jane Doe* at 383.

We recognize that the right to refuse treatment is not absolute and must be weighed against those

competing governmental interests. *Deel v. Syracuse Veterans Administration Medical Center,* 729 F.Supp. 231, 233 (N.D.N.Y. 1990); *Gray v. Romeo,* 697 F.Supp. 580 (D.R.I. 1988). However we also recognize the state's duty must encompass a recognition of an individual's right to make decisions regarding the quality of life. *Id.* at 588. The commonwealth's interest weakens and the individual's right grows as the prognosis dims and the intrusiveness of the treatment increases. *In re Jane Doe, supra,* at 385; *Brophy v. New England Sinai Hospital Inc.,* 497 N.E.2d 626, 637 (Mass. 1986). Consequently, when the individual is in an irreversible persistent vegetative state, to recognize the patient's right to decide to terminate an artificial life-sustaining treatment in these narrow and extreme circumstances would not undermine the state's interest. *Foody v. Manchester Memorial Hospital,* 482 A.2d 713, 718-9 (Conn. Super. 1984):

The state's interest in the prevention of suicide is likewise inapplicable. Suicide by definition is "the deliberate termination of one's existence." Black's Law Dictionary (5th ed. 1979). The removal of Ruth Ragona's nasogastric feeding tube will permit her to die from the natural progression of her illness. *In re Jane Doe* at 386. Accord, *Gray* at 589 (state interest in the prevention of suicide is not an issue "as there is an obvious distinction between deliberately ending a life by artificial means and allowing nature to take its course"). Finally, the state's interest in the maintenance of the ethical integrity of the healthcare profession is not jeopardized by these proceedings since adherence to Ruth Ragona's wishes is consistent with the ethics of the medical profession. *In re Guardianship of Browning v. Herbert, supra.* It is clear that Ruth Ragona's constitutional right to refuse artificial nutrition is paramount to and outweighs any applicable state's interest.

Ergo, this decision regarding removal of life-sustaining treatment is made more certain where the state's interest gives way to Ruth Ragona's right to self-determination. "Every human being of adult years and sound mind has a right to determine what shall be done with his own body. . ." *Cruzan* at 2847. We feel it is also important to note that the Attorney General at no time expressed an adversarial interest in these proceedings, while advocating the necessity for the orderly development of the law in this area. (T.R. 10.)

Since Ruth Ragona is currently a patient at Moses Taylor Hospital, it has been named as an indispensable party to this proceeding in accordance with 42 Pa.C.S. §7540(a). We find Moses Taylor, also, never sought to challenge the relief requested in the instant case. (November 20; 1990 — T.R. 19.) In particular Moses Taylor Hospital urged the court to find that the plaintiff's testimony presented at the evidentiary hearing satisfied the standard of clear and convincing evidence. (November 20, 1990 — T.R. 15.)

The District Attorney of Lackawanna County, also an indispensable party to this action, asked that the court apply the clear and convincing evidence standard of proof to the matter sub judice, (November 20, 1990 — T.R. 36), and further provided by memorandum to the court, "If this honorable court enters an order granting the relief requested . . . then the district attorney will not prosecute any charges against any individuals or entities which act in conformity with the order of court." See memorandum, November 21, 1990.

The court-appointed guardian ad litem, representing the interest of Ruth Ragona, stated he had no position as to what standard the court should apply, but it was his opinion that the petitioner had

presented to the court clear and convincing evidence of Ruth Ragona's expressed intent. (November 20, 1990 — T.R. 25.)

Finally, the family of Ruth Ragona (Joseph Ragona, her husband, and their children, Michael, Joseph Jr., Robert and Mary) signed a general release absolving any and all persons from any and all potential liability that there could feasibly or possibly be if the feeding tubes were removed pursuant to a court order. (T.R. 107; plaintiff's exhibit 14.)

We find there exists no unresolvable disagreement between the parties represented in this case and there is a general consensus regarding the appropriate result.

The court is also cognizant of the fact that this case raises emotionally charged issues. In addition to the inevitable moral issues involved, there is the question of the wisdom and appropriateness of adjudicating a matter so private, yet of such public interest. The public policy question must begin with a discussion of whether the "right to die" is a violation of public policy. Unfortunately, the legislature has not directly addressed the question. Thus, this court finds that the "right-to-die," in the absence of directly applicable legislation to the contrary, is not per se violative of any public policy of this state. The legislature remains free to deal with this most sensitive issue as it sees fit, subject only to constitutional constraints.

This court concludes and holds that the right to refuse artificial nutrition and hydration is valid and enforceable. We submit petitioner has presented to the court strongly persuasive, clear and convincing evidence of Ruth Ragona's prior expressed intent to forego such artificial nutrition and hydration. Ac-

cordingly, we will issue an order specifically enforcing the expressed intent of Ruth Ragona.

## ORDER

Now, November 30, 1990, having duly considered: the petition, evidence introduced at the hearing on November 5, 1990, memorandums of law, able counsels' oral argument on November 20, 1990 and for the reasons set forth in the above opinion, the prayer of petitioner is hereby granted.

Further, it is specifically ordered and decreed that the Moses Taylor Hospital and the attending physicians, or their duly appointed representatives or agents, are authorized and empowered to adhere to Ruth Ragona's expressed intent and remove the artificial nutrition and hydration tubes presently engaged and employed in her care and treatment, in conformity with the above opinion, without their incurring any criminal or civil liability under the laws of this commonwealth.

Lastly, the court will retain continuing jurisdiction of the matter sub judice.