OPINION OF THE COURT
Lawrence E. Kahn, J.
Before the court is a challenge to a do not resuscitate (DNR) order that was written under article 29-B of the Public Health Law. This proceeding brings the court to the turbulent, and often muddy, confluence of law and medicine.
Leonard B. is a client of the Oswald D. Heck Developmental Center (O.D. Heck), a facility under the jurisdiction of the Office of Mental Retardation and Developmental Disabilities. (Mental Hygiene Law § 13.17.) He is 67 years old and has been institutionalized since age five. He is profoundly retarded and suffers from assorted ailments and disorders, though none of these are life-threatening.
Leonard’s legal guardian, pursuant to SCPA article 17-A, is his sister, Petronella Ziegler. As his legal guardian, Ms. Ziegler asked Leonard’s attending physician, Dr. Neal Baillargeon, to review his case and write a DNR order for Leonard. On July 6, 1994, Dr. Baillargeon rendered the opinion that a DNR order should be written. On July 8, 1994, Dr. Brian Daggett also examined Leonard and concurred that a DNR order should be written. On July 11, 1994, a psychologist employed by O.D. Heck evaluated Leonard and found that Leonard lacks the capacity to understand and appreciate the nature and consequences of a DNR order. Dr. Baillargeon wrote the DNR order for Leonard on July 14, 1994.
Shortly after the DNR order was written, Dr. Luna Risemberg, O.D. Heck’s Chief Medical Officer, and Dr. Stephan Sell, another O.D. Heck physician, examined Leonard and believed that the DNR order was not warranted. By order to show cause dated August 22, 1994, Fred F. Finn, the Director of O.D. Heck, brought on the instant proceeding to remove and rescind the DNR order. The Mental Hygiene Legal Service joined in the application on behalf of Leonard. (See, Mental Hygiene Law § 47.03.) The DNR order has been stayed pending this decision. (Public Health Law § 2973 [2].)
Dr. Michael Wolff was, by order of this , court, appointed as an independent physician to examine Leonard and render an opinion relative to this proceeding. This was done and on January 12, 1995, all parties were heard and testimony was taken from Drs. Risemberg, Wolff and Baillargeon.
*521 Cardiopulmonary resuscitation (CPR) is defined by statute as "measures, as specified in regulations to be promulgated by the commissioner, to restore cardiac function or to support ventilation in the event of a cardiac or respiratory arrest. Cardiopulmonary resuscitation shall not include measures to improve ventilation and cardiac functions in the absence of an arrest.”* (Public Health Law § 2961 [4].)
Chapter 818 of the Laws of 1987, codified as article 29-B of the Public Health Law, was wisely enacted by the Legislature as a comprehensive scheme to define the rights and duties of all parties involved when a decision is reached that CPR should not be attempted. CPR can be a vital life-saving treatment where death would otherwise ensue. It can also be an unwarranted treatment subjecting the patient to a painful, invasive and ultimately futile procedure in the closing moments of life. (See, Sorum, Limiting Cardiopulmonary Resuscitation, 57 Alb L Rev 617.)
The Legislature has created in this statute the natural presumption that all persons would want CPR in the event of cardiac or respiratory arrest. (Public Health Law § 2962 [1].) This presumption comports with established common law and applies with equal force to competent persons and to developmentally disabled persons like Leonard. (Matter of O’Connor, 72 NY2d 517.)
When one is said to be unable to make a decision regarding a DNR order, there are particular parameters which must be observed before a surrogate may decide that resuscitation should not be undertaken. Even the best intentions of loved ones cannot override the strict interpretation that must be given to this law.
There is a question whether this proceeding has been prematurely commenced in that the parties have not participated in any dispute mediation system as contemplated by the statute. (See, Public Health Law § 2972.) With respect to judicial review, the statute clearly provided "that the department of health or any other duly authorized state agency may commence an action or proceeding to enjoin a violation of this *522 article at anytime.” (Public Health Law § 2973 [3].) The Office of Mental Retardation and Developmental Disabilities and by extension, its division O.D. Heck, has "[t]he responsibility for seeing that * * * the personal and civil rights of persons receiving care and treatment are adequately protected.” (Mental Hygiene Law § 13.07 [c].) Leonard is such a person and the instant proceeding is properly before the court.
There is no dispute that Leonard is profoundly retarded and possesses an IQ of approximately 20. No party or witness in these proceedings has ever suggested that Leonard has possessed decision-making abilities at any time in his 67 years. However, the law requires that "[a] determination that an adult patient lacks capacity shall be made by the attending physician to a reasonable degree of medical certainty. The determination shall be in writing and shall contain such attending physician’s opinion regarding the cause and nature of the patient’s incapacity as well as its extent and probable duration. The determination shall be included in the patient’s medical chart.” (Public Health Law § 2963 [2].) This determination must be made in each case because the statute presumes all persons have capacity notwithstanding that a guardian has previously been appointed. (See, Public Health Law § 2963 [1].)
Dr. Baillargeon made no such determination before writing the DNR for Leonard. His written report made after his examination of Leonard did not address capacity, it only set forth his reasons why a DNR order should be written. A psychological assessment was done by an O.D. Heck psychologist who found that Leonard lacked capacity. (See, Public Health Law § 2963 [3] [c].)
Dr. Baillargeon’s failure to make a written determination regarding Leonard’s capacity, as required, is sufficient reason to rescind the DNR order. Nevertheless, the court will reach the remaining issues raised by the parties based upon the authority vested in a court in section 2976 (2) of the Public Health Law and since it is clear that Dr. Baillargeon and everyone else involved in these proceedings is in agreement that Leonard lacks capacity to make a decision regarding the DNR order.
The law requires Leonard’s surrogate to make her decision regarding CPR on the basis of his best interests. (Public Health Law § 2965 [3] [a].) She may, however, consent to a DNR order
*523 "only if there has been a determination by an attending physician with the concurrence of another physician selected by a person authorized by the hospital to make such a selection, given after personal examination of the patient that, to a reasonable degree of medical certainty:
"(i) the patient has a terminal condition; or
"(ii) the patient is permanently unconscious; or
"(iii) resuscitation would be medically futile; or
"(iv) resuscitation would impose an extraordinary burden on the patient in light of the patient’s medical condition and the expected outcome of resuscitation for the patient.” (Public Health Law § 2965 [3] [c].)
Dr. Baillargeon and a concurring physician, Dr. Daggett, opine in their examination reports that "in the event of illness severe enough to cause respiratory and/or cardiac arrest, CPR would be medically futile.” On that ground both physicians agreed that a DNR order should be written. By statute, " 'medically futile’ means that cardiopulmonary resuscitation [would] be unsuccessful in restoring cardiac and respiratory function or that the patient will experience repeated arrests in a short period of time before death occurs.” (Public Health Law § 2961 [12].)
There is no evidence before the court, never mind evidence demonstrating to a reasonable medical certainty, that Leonard’s present medical condition would make CPR a medically futile treatment. The evidence shows that although he has several chronic illnesses, Leonard is not acutely ill and his illnesses are not life-threatening. Dr. Baillargeon was the only physician to testify that he thought Leonard’s case fit the criteria for "medically futile.” However, he also testified: "[m]y feeling and the reason I wrote the DNR is he may not have a life-threatening illness right now, but this is so that in the future when something happens, and eventually it will for everybody, but for [Leonard] if it comes to the point where in the layman’s sense he dies, meaning that his heart stops and he stops breathing, that’s when we are not going to step in.”
The above testimony in the context of the other evidence makes it clear that the DNR order was not supported by a finding that Leonard’s current medical condition would make CPR a medically futile treatment as defined by statute. (Public Health Law § 2961 [12].) Rather, Dr. Baillargeon testified during cross-examination that the DNR order was "a living will” for Leonard to become effective prospectively, as he *524 stated in his report: "in the event of an illness severe enough to cause respiratory and cardiac arrest.”
This is a violation of the general intent and express provisions of the statute which clearly require a surrogate DNR order to be supported by the current medical condition of the patient. Indeed, the statute provides for continual physician review of a surrogate DNR order and requires the physician to immediately cancel the DNR order if the patient no longer suffers from one of the four statutorily defined medical conditions. (Public Health Law § 2970 [2] [b].) The legislative history underlying article 29-B strongly supports this analysis.
The law of this State, with limited exceptions, such as Public Health Lav/ article 29-B, provides that the right to decline treatment is personal and cannot be exercised by a third party when a patient is unable to do so. (Matter of O’Connor, 72 NY2d 517, 528, supra.) Therefore, absent a constitutional legislative enactment, living wills cannot be imputed to those who are incompetent to make them.
Dr. Baillargeon also testified, and Ms. Ziegler has urged, that the DNR order should be upheld because "resuscitation would impose an extraordinary burden on the patient in light of the patient’s medical condition and the expected outcome of resuscitation for the patient.” (Public Health Law § 2965 [3] [c] [iv].) The question, then, is whether Leonard’s current medical condition is such that CPR would impose "an extraordinary burden” on him. (Ibid.)
Dr. Baillargeon bases his opinion that CPR would impose an extraordinary burden on Leonard on the fact that he is profoundly retarded and would likely be more severely retarded after the administration of CPR. Dr. Baillargeon believes there would be "a high chance” Leonard would not be able to engage in the activities he is currently able to do after a significant cardiac arrest and resuscitation.
The statute offers no definition for the term "extraordinary burden” as it did for "medically futile.” (See, Public Health Law § 2961 [12].) This is troubling because the court is called upon to review the physician’s determination and the term "extraordinary burden” allows for variant subjective interpretations by each physician. Construing "extraordinary burden” with the balance of the statutory clause: "in light of the patient’s medical condition and the expected outcome of resuscitation for the patient” offers little guidance. This language only states the obvious considerations.
*525 "Extraordinary burden on the patient” could, in terms of the nature of the burden, reasonably mean an extraordinary physical, psychological, emotional or even economic burden. In terms of time, "extraordinary burden” could refer to the physical experience of undergoing CPR or to the quality of one’s life after resuscitation. Dr. Baillargeon has determined that CPR would impose an extraordinary burden on Leonard by assessing his present level of disability and by estimating what it would be after resuscitation. Dr. Baillargeon, in making this determination, has set a benchmark for Leonard below which his life is deemed not worth living.
Although Leonard’s life as a developmentally disabled person may seem a small possession from the perspective of some, it remains his possession and "no person or court should substitute its judgment as to what would be an acceptable quality of life for another.” (Matter of O’Connor, 72 NY2d 517, 530, supra, citing People v Eulo, 63 NY2d 341.) The "extraordinary burden” provision of the statute opens the door to the treatment of the mentally and developmentally disabled as second-class citizens and any perceived possible diminution in their "quality of life” could be a basis for the denial of lifesaving treatment. The mentally and developmentally disabled should not become the first casualties of this vague statutory provision.
Leonard’s right to life is unquestionably implicated in any decision to deny him essential medical care. (Matter of O’Connor, supra, at 531.) It is true that all statutes enjoy a strong presumption of constitutionality. (Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d 313, 319-320.) It is also settled that due process only requires statutes to be written with a "reasonable degree of certainty so that individuals of ordinary intelligence are not forced to guess at the meaning of statutory terms.” (Foss v City of Rochester, 65 NY2d 247, 253.) The "extraordinary burden” section of the statute (Public Health Law § 2965 [3] [c] [iv]) nevertheless fails to pass constitutional muster since it is beyond doubt subject to numerous meanings and therefore uncertain and vague. This is a constitutional infirmity for civil as well as criminal statutes. (Goldberg v Corcoran, 153 AD2d 113, 118.)
*526 The good faith of Leonard’s physician and the loving devotion of his sister are not called into question here. However, for now, absent conditions satisfying the constitutional provisions of article 29-B, a DNR order may not be written for Leonard.
The petition is granted.

 The regulation promulgated gives examples of these "measures” which include "manual chest compression, mouth-to-mouth rescue breathing, intubation, direct cardiac injection, intravenous medications, electrical defibrillation and open-chest cardiac massage.” (10 NYCRR 405.43 [b] [4].) The regulation also states that CPR shall "include the transfer of a patient to another facility solely for the purpose of providing cardiopulmonary resuscitation.” (Ibid.)