[821 NYS2d 194]

In the Matter of the Guardianship of CHANTEL NICOLE R., Appellant. PAMELA R., Respondent; ATTORNEY GENERAL OF THE STATE OF NEW YORK, Intervenor.

First Department, September 21, 2006

## APPEARANCES OF COUNSEL

*Marvin Bernstein, Mental Hygiene Legal Service*, New York City (*Karen Gomes Andreasian* of counsel), for appellant.

*Norman L. Cantor*, of the New Jersey Bar, admitted pro hac vice, of counsel, and *Gibson, Dunn & Crutcher LLP*, New York City (*Mark E. Bini* and *Randy M. Mastro* of counsel), and *Association for the Help of Retarded Children*, New York City (*Laurie A. Stride* of counsel), for respondent.

*Eliot Spitzer, Attorney General*, New York City (*Oren L. Zeve, Caitlin J. Halligan* and *Daniel Smirlock* of counsel), for intervenor.

*Tania F. Seaburg* and *John F. Von Ahn*, Delmar, for NYSARC, Inc., amicus curiae.

## OPINION OF THE COURT

Tom, J.P.

This dispute arises out of the appointment, pursuant to SCPA 1750, of petitioner Pamela R. as guardian of the person of her daughter, respondent Chantel R., a 26-year-old mentally retarded person. Mental Hygiene Legal Service, on Chantel's behalf, objects to the appointment to the extent that the guardianship extends to decisions concerning life-sustaining treatment and challenges the constitutionality of the statute under equal protection, due process and vagueness grounds.

Respondent is described as "moderately retarded" but otherwise does not suffer from any particular illness or condi-

tion requiring medical treatment.* The guardianship petition was supported by affidavits from two psychologists who assessed respondent's academic functioning at the first-to-second-grade level and found that she is incapable of making informed or reasonable judgments concerning the withholding or withdrawal of life-sustaining medical care. The affidavits indicate that respondent has an IQ of 52 with cognitive deficits in executive functions and metamemory, which are necessary to abstract reasoning. She is functionally independent in the area of self-care (eating, dressing, bathing, personal hygiene) but is incapable of traveling by herself or performing basic financial transactions, such as making change. Philip Hore, Ph.D. supplemented his psychological assessment, attesting that he had discussed end-of-life issues with respondent and although she had voiced objection to granting her mother authority to withdraw life support, he did not find her capable of even considering the question in the abstract. He stated that her anxiety about death prevented respondent from making a distinction between dying and death that results from the removal of life-sustaining equipment. Alan Felipe, Ph.D. testified that he did not specifically raise end-of-life concerns with respondent but concluded, based on her general cognitive ability, that she lacks the capacity to make a decision regarding her medical treatment.

In a motion for the declaration of her rights under SCPA 1750, respondent asserted that she had expressed objection to granting her mother the power to terminate life-sustaining medical care and requested that the court "determine, after an evidentiary hearing, that she is capacitated to make this specific objection because she understands the meaning of the words with which she has expressed it." She argued that SCPA 1750-b impinges on her fundamental right to life and that the statute grants a guardian the power to make life-and-death decisions without affording a procedure for the proposed ward to object and without specifying a standard of proof for overcoming the objection. She asserted that such substantive and procedural omissions deny her due process by failing to protect her right to life and her prerogative to make medical decisions. Respondent requested a hearing to challenge the sufficiency of the medical certifications, which the court granted.

At the hearing, three experts, including an independent psychologist, opined that Chantel lacked the capacity to make

---

* A physician's report notes, "She is also a 'borderline diabetic' but this condition is controlled through diet."

determinations of health care, including end-of-life decisions. Dr. Hore testified that he had supervised respondent's counseling at Lifespire, her group residence, but had only met with her twice. In the course of his discussion with respondent, she expressed the desire to have her mother present to help her if she was connected to life-support equipment. But when he interjected the word "dying" into the conversation, respondent "was not happy at all and said that wouldn't be good, no, I wouldn't want that. I don't want to die." While respondent understood death, he stated, consistent with his affidavit, that she lacked sufficient understanding to object to her mother's role in her medical treatment.

Respondent testified that she wanted her mother to make medical decisions on her behalf. However, respondent indicated that she would want food, water and other medical treatment continued even if her condition was terminal and she might suffer longer before she passed away.

Dr. Felipe, an independent psychologist appointed to conduct an evaluation of respondent, testified that she and her mother have a very close relationship and that respondent had stated her desire to have her mother make decisions for her if she was unable to express her wishes. He stated that he had no reservations in stating that respondent lacks the capacity to make any serious medical decisions.

The court also heard testimony from Dr. Susan Pincus, medical director for the Association for the Help of Retarded Children, who also conducted an evaluation of respondent. The doctor assessed respondent, with a mental age of seven, as being incapable of comprehending the concept of withholding medical treatment. However, respondent was very clear that she wanted her mother to make her medical decisions.

The Surrogate held that the petition is subject to the Surrogate's Court Procedure Act, as amended (L 2002, ch 500, § 2), which expressly requires a finding that a mentally retarded person is incapable of making health care decisions before a guardian may be appointed with the authority to withhold or withdraw life-sustaining medical care (SCPA 1750 [2]; see Matter of M.B., 6 NY3d 437, 441 [2006]). The court found that respondent's answers to questions concerning end-of-life decisions failed to reflect a true appreciation of the consequences of such decisions or even an awareness of the context in which such a determination might be required, concluding that respondent's utterances should not be accorded legal effect.

Based on its finding that respondent is incapacitated, the court held that delegation of the authority to make end-of-life decisions to petitioner was appropriate. The court rejected respondent's contention that the statute violated the Equal Protection Clause and that it was unconstitutionally vague. The court declined to decide if the discretion afforded by statute to dispense with a hearing (SCPA 1754) might violate due process because respondent was afforded a hearing in this case. The instant appeal ensued.

This Court holds that any disparity in treatment of a mentally retarded person is justified by legitimate state interests, that respondent has been accorded due process and is not aggrieved on such grounds and that the asserted vagueness of any statutory provision with respect to the withholding or withdrawal of medical treatment is not before us. Therefore, we affirm the ruling in all respects.

As noted in *Matter of Storar* (52 NY2d 363, 377 [1981], *cert denied* 454 US 858 [1981]), "The State has a legitimate interest in protecting the lives of its citizens." It may impose treatment upon an individual to combat a health threat and disallow medical procedures that are inherently hazardous to health (*id.*). However, the State's interest, as manifested by statute and case law, supports the right of a competent adult to decide whether or not to undergo treatment, as reflected in the civil liability imposed for rendering treatment without consent, even though "treatment may be beneficial or even necessary to preserve the patient's life" (*id.*).

*Storar* drew a sharp distinction between the ability of a competent individual to leave instructions regarding the rendering or withholding of medical care and the absence of any such capacity in a person who, like Chantel R., was never competent to make decisions about medical care. Any such person "was always totally incapable of understanding or making a reasoned decision about medical treatment. Thus it is unrealistic to attempt to determine whether [s]he would want to continue potentially life prolonging treatment if [s]he were competent" (*Storar*, 52 NY2d at 380). Invoking the State's interest, as parens patriae, in protecting health and welfare, the Court held that a guardian could not seek to discontinue treatment on behalf of a ward who was never competent. The Court emphasized that the Legislature was the appropriate body to change the law to "enlarge the role of the courts in cases involving discontinuance of life sustaining treatment for incompetents by

establishing . . . a mandatory procedure of successive approvals by physicians, hospital personnel, relatives and the courts" (*id.* at 382-383). *Storar* remained the law for some 20 years.

In 1999, a severely mentally retarded woman, Sheila Pouliot, became terminally ill. It was alleged that she suffered greatly, and needlessly, because the law then required that she receive care, even though her doctors concluded that it was futile. She lived for several weeks, allegedly in pain, over the objections of her sister and the ethics board of the treating hospital. The Pouliot case was widely publicized. Shortly thereafter, the Health Care Decisions Act for Persons with Mental Retardation (L 2002, ch 500) was enacted to afford a guardian some latitude in determining whether medical care should be administered to a ward who was never competent to make decisions regarding medical treatment. As noted by the Court of Appeals, "The Assembly sponsor stated that the purpose of the bill was to 'allow the legally appointed guardians of mentally retarded individuals to have the authority to make medical decisions on behalf of such person, including decisions dealing with the withdrawal or withholding of life-sustaining treatment' " (*Matter of M.B.,* 6 NY3d at 449).

Respondent does not contest the factual findings as to her mental capacity made by the motion court. Rather, she interposes challenges to the SCPA, asserting constitutional violations predicated upon equal protection, due process and vagueness. Respondent argues that the statute violates her state and federal constitutional rights to equal protection precisely because it treats her differently from persons who were once competent. She asserts that equal protection was denied her because the person of average functional ability is not required to show that a decision to pursue life-sustaining measures "is based on any abstract understanding of life, death or modern medicine." She notes that "the common law has never given effect to a never-capacitated person's right to refuse treatment" (citing *Matter of Westchester County Med. Ctr. [O'Connor],* 72 NY2d 517 [1988]). Thus, she argues, equal protection "is violated by evaluating the validity of a mentally retarded person's expressions of a desire to be kept alive when at common law the expressed wishes to live of all others would be taken at face value."

Respondent's contention is without merit. The Surrogate properly concluded that a mentally retarded person's expression of a desire to continue life-sustaining measures is categorically

distinguishable from the same desire expressed by a mentally competent individual because only the latter has the capacity to appreciate the consequences of the decision and thus the ability to make the choice to pursue an uninformed or irrational alternative. Respondent's conclusion that treating her differently from a competent person offends her constitutional rights is flawed. The Equal Protection Clause only prohibits the government from treating persons differently from others who are similarly situated, and mentally retarded persons are not similarly situated to those who were once competent. The difference in treatment of discrete groups need only be rationally related to a legitimate government interest in order to pass constitutional muster (*Cleburne v Cleburne Living Center, Inc.,* 473 US 432, 446-448 [1985]), and retarded persons are appropriately treated differently when disparate treatment furthers a legitimate state interest and has a rational basis (*see Heller v Doe,* 509 US 312, 320-321 [1993]). Respondent does not dispute that the State has a legitimate interest in advancing the right of mentally retarded persons to be free from prolonged suffering; rather, she argues that the disparate treatment of mentally retarded persons and once-competent persons lacks a rational basis.

This argument ignores the legal dilemma the statute was designed to redress. As the Court of Appeals held in *Storar* (52 NY2d at 380), whether a mentally retarded person would elect to receive life-prolonging treatment is impossible to determine because such an individual has never been competent to make a decision concerning medical care. Thus, there is no opportunity to demonstrate that a mentally retarded person would have elected to terminate life-sustaining measures under circumstances providing no hope for recovery (*id.*), requiring such person to undergo futile procedures that have no medical benefit and subject the patient to an unnecessarily prolonged and painful demise (*see Blouin v Spitzer,* 213 F Supp 2d 184, 187 [ND NY 2002], *affd* 356 F3d 348 [2d Cir 2004]). As such, it is impossible to apply to mentally retarded persons the same procedures for terminating life-sustaining treatment that the law affords to previously competent patients.

It should be noted that the SCPA does not offend equal protection by failing to redress the plight of all similarly situated persons who were never competent to make an informed decision regarding medical treatment. The Legislature is under no obligation to attempt to remedy all aspects of a problem at once.

Rather, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind" (*Williamson v Lee Optical of Okla., Inc.*, 348 US 483, 489 [1955]). Significantly, respondent makes no allegation that the statute involves "invidious discrimination" prohibited by the Equal Protection Clause (*id.*).

Respondent argues that the statute violates due process because appointment of a guardian with the consent of both parents, as here, does not require the court to hold a hearing (SCPA 1754). However, her contention regarding the omission of a requirement to conduct a hearing in every instance before appointing a guardian imbued with the power to make end-of-life decisions presents no basis for appellate review. Having sought and received a hearing, respondent has obtained the full relief she sought and is not aggrieved by the order (CPLR 5511; *T.D. v New York State Off. of Mental Health*, 91 NY2d 860, 862 [1997] ["inappropriate advisory opinion"]; *Matter of Bayswater Health Related Facility v Karagheuzoff*, 37 NY2d 408, 412-413 [1975]).

Finally, respondent contends that the statute is unconstitutionally vague because it permits a guardian to terminate life support when an attending physician determines, inter alia, that

> "the life-sustaining treatment would impose an extraordinary burden on such person, in light of:
>
> "A. such person's medical condition, other than such person's mental retardation; and
>
> "B. the expected outcome of the life-sustaining treatment, notwithstanding such person's mental retardation" (SCPA 1750-b [4] [b] [ii]).

Respondent argues that in adopting the extraordinary burden criterion, "the statute unavoidably calls for a subjective determination of a mentally retarded ward's quality of life." She asserts that the term is sufficiently broad and ill-defined as to invest unfettered discretion in a person making a decision to terminate or withhold life-sustaining measures. She concludes that the criterion is "too subjective to yield results that have any predictability or reviewability to protect against error and abuse," and defies review by requiring an appellate court to assess "the physician's subjective determination of what constitutes an extraordinary burden."

This Court likewise offers no opinion on whether the statutory "extraordinary burden" standard for the withholding or

withdrawal of life support is unconstitutionally vague. Respondent is not now, and may never be, the subject of any procedure, determination or action under SCPA 1750-b because she may never require life-sustaining measures. A court "should not resolve disputed legal questions unless this would have an immediate practical effect on the conduct of the parties" (*New York Pub. Interest Research Group v Carey*, 42 NY2d 527, 530 [1977]). Even "a request for a declaratory judgment is premature if the future event is beyond the control of the parties and may never occur" (*id.* at 531; *see Prashker v United States Guar. Co.*, 1 NY2d 584, 592 [1956] ["The courts do not make mere hypothetical adjudications, where there is no presently justiciable controversy before the court, and where the existence of a 'controversy' is dependent upon the happening of future events"]).

Accordingly, the order of the Surrogate's Court, New York County (Eve Preminger, S.), entered on or about December 14, 2004, which appointed petitioner the guardian of respondent's person with authority to make decisions concerning life-sustaining treatment on her behalf, should be affirmed, without costs.

ANDRIAS, FRIEDMAN, WILLIAMS and SWEENY, JJ., concur.

Order, Surrogate's Court, New York County, entered on or about December 14, 2004, affirmed, without costs.