Matter of Sloane v M.G. (2018 NY Slip Op 05800)





Matter of Sloane v M.G.


2018 NY Slip Op 05800


Decided on August 16, 2018


Appellate Division, First Department


Renwick, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 16, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

John W. Sweeny, J.P.
Dianne T. Renwick
Peter Tom
Angela M. Mazzarelli
Jeffrey K. Oing, JJ.


160704/16 5872 

[*1]In re Mark F. Sloane, M.D., etc., Petitioner-Respondent,
v
M.G., Respondent-Appellant.



Respondent appeals from an order of the Supreme Court,
New York County (Nancy M. Bannon, J.), entered on or about December 27, 2016, which, among other things, after a hearing, granted petitioner's application for authorization to withdraw life-sustaining treatment from respondent, and denied Mental Hygiene Legal Service's objection to the decision of the guardian to withdraw life-sustaining treatment.




Marvin Bernstein, Mental Hygiene Legal Service, New York (Margo Flug and Sadie Ishee of counsel), for appellant.
Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, Rochester (Allan Edward Silver of counsel), for respondent.



RENWICK, J.


This is an appeal from an order that authorized petitioner physician, after a hearing pursuant to the Surrogate's Court Procedure Act (SCPA-1750-b), to withdraw life-sustaining treatment from a developmentally disabled person (M.G.), in accordance with the decision of his [*2]guardian [FN1]. Applying SCPA 1750-b's best interests standard, Supreme Court granted the order over the objection of Mental Hygiene Legal Service (MHLS) that a meaningful inquiry into M.G.'s end-of-life wishes should have been conducted because M.G. had some prior capacity to make health care decisions (compare SCPA 1750-b with Public Health Law article 29-cc; see also Matter of Chantel Nicole R. (Pamela R.) 34 AD3d 99 [1st Dept 2006], appeal dismissed 8 NY3d 840 [2007]). This case presents a similar equal protection claim to the one this Court rejected in Chantel: whether treating an intellectually and developmentally disabled person who had some prior capacity to make health care decisions [FN2] differently from a previously competent, non-disabled person [FN3] violates the equal protection rights of the intellectually and developmentally disabled person. In Chantel, we concluded that there was no violation of the Equal Protection Clause, because intellectually and developmentally disabled persons are not similarly situated to once competent persons and that the disparate treatment of the SCPA 1750-b was rationally related to a "legitimate [government] interest in advancing the right of [intellectually and developmentally disabled] persons to be free from prolonged suffering" (34 AD3d at 105). For the reasons explained below, we reject the equal protection challenge in this case as well.
Factual and Procedural Background
The facts leading to this Equal Protection claim are essentially undisputed. M.G. was an 80-year-old man with a fullscale IQ of 47. Before his December 2, 2016 admission to NYU Hospital Center (NYU), M.G. resided, for 35 years without a guardian, at a community residence for the developmentally disabled and made his own health care decisions.
On December 2, 2016, M.G. presented to NYU's Emergency Department complaining of shortness of breath. He was examined, and stayed overnight in the Observation Unit. On December 3, 2016, at 2:03 a.m., M.G. was discharged with a diagnosis of "Chronic Obstructive Pulmonary Disease, Exacerbation." However, on December 5, 2016, M.G. was brought back to NYU, after suffering cardiac arrest. He was diagnosed with anoxic brain injury and admitted to the intensive care unit. Due to the injury, M.G. was in a permanent vegetative state, dependent on a ventilator, and not responsive to verbal or noxious stimuli [FN4]. In addition, he suffered from multiple failures of the lungs, kidneys, and brain. His attending physician, petitioner Dr. Mark F. [*3]Sloane, opined that there was no meaningful hope of recovery. On December 8, 2016, further examinations by various doctors confirmed that M.G. lacked the capacity to make health care decisions.
On December 12, 2016, Rachel Osher, M.G.'s cousin and guardian,[FN5] pursuant to SCPA 1750-b(1)(a), expressed her decision to move M.G. to hospice care and gradually withdraw life-sustaining treatment, pursuant to SCPA 750-b(4)(c)(ii). Dr. Sloane, with a second doctor's concurrence, determined that life-sustaining treatment imposed an extraordinary burden on M.G., in light of his medical condition and the expected outcome of treatment, given his multiple organ failures [FN6]. As a result, pursuant to SCPA 1750-b(4)(e)(ii), Dr. Sloane informed M.G.'s community residence and MHLS of the guardian's decision to withdraw life-sustaining treatment. MHLS, as counsel for M.G., objected, suspending the guardian's decision, pending judicial review, according to SCPA 1750-b(5)(a) & (6).
On December 22, 2016, Dr. Sloane petitioned to authorize the guardian to withdraw life-sustaining treatment from M.G., in his best interests, and to deny MHLS's objection, pursuant to SCPA 1750-b(6). Among other things, the petition asserted that neither the guardian nor anyone else was aware of M.G.'s wishes with respect to treatment for his current condition and that given M.G.'s multiple organ failures and the absence of meaningful hope of recovery, the guardian's decision to move M.G. to hospice care and gradually withdraw life-sustaining treatment was in M.G.'s best interests.
The hearing to determine whether to withdraw life-sustaining treatment from M.G. took place the next day. At the inception, MHLS moved to summarily dismiss the petition, arguing that petitioner should proceed under article 29-CC of the Public Health Law and not SCPA 1750-b, since M.G. was previously found to have capacity to request life-sustaining treatment, and thus a meaningful inquiry into his end-of-life wishes should control, rather than merely a "best interests" analysis, and that proceeding otherwise would violate his equal protection rights. Dr. Sloane, however, argued that the application was properly brought under SCPA 1750-b, since M.G. was in a permanent vegetative state, lacked capacity to make health care decisions, was developmentally disabled with a full-scale IQ of 47, had no advanced directives in place, and had not discussed his wishes with his guardian, who lived in Chicago, or anyone at his community residence.
At the hearing, Dr. Sloane testified that he had been M.G.'s attending physician since he had begun treating him in NYU's intensive care unit, on December 5, 2016, when M.G. suffered cardiac arrest, causing him to sustain a brain injury due to lack of oxygen to the brain. As a result, M.G. had no capacity to make medical decisions, since he had no neurologic function and did not respond to stimuli or breathe without a ventilator. M.G. required intubation and mechanical ventilation because of the brain injury, was undergoing hemodialysis for kidney failure, and had suffered a bilateral pneumothorax (collapsed lung), requiring chest tubes to be placed in each lung. In addition, M.G. was fed through a nasogastric tube, which would need to be replaced with a PEG (percutaneous endoscopic gastronomy) tube inserted into his stomach. Dr. Sloane opined that the need for hemodialysis, the chest tubes, and ventilation were ongoing, that M.G.'s lack of cognitive ability could not be cured, and that there was no chance of [*4]meaningful neurological recovery.
Before his catastrophic illness, no one at NYU had asked M.G. whether he had a preference with regard to life-sustaining treatment. However, M.G.'s medical records indicate that on December 3, 2016, a "Full Code" order had been entered. Dr. Christopher Caspers, the Medical Director of the Observation Unit, explained that a Full Code meant that
"in the event of cardiac or cardiopulmonary arrest, that we would do the components of what we consider for a full code in terms of resuscitating the patient, which would include chest compressions and ventilator support, and it can include defibrillation, and it could also include medications that are common to ACLS [Advanced Cardiac Life Support] protocol."
Dr. Caspers further explained that a Full Code did not address a patient's wishes regarding life-sustaining treatment. Instead, patients were informally assessed for the capacity to make health care decisions on an ongoing basis, as part of providing clinical care. Thus, if there was a Full Code order in a patient's chart, it was presumed that the patient was competent to make the decision.
The Full Code order was entered by Ursula Jemiolo, a physician assistant in the Observation Unit. Jemiolo testified that her discussions with M.G. entailed only CPR, with no discussion of other treatment options, such as dialysis and that M.G. had been able to make the decision regarding the code status. Jemiolo explained that, when ascertaining a patient's wishes as to Full Code status, she asked questions such as:
"In case, when you cannot breathe on your own, do you want us to help you breathe by putting a tube down your throat . . . if it's necessary? Or, if the heart stops, do you want us to do chest compressions? Or . . . if you have abnormal heart rhythm, do you want us to use electricity to treat the abnormal rhythm? Medications by IV . . . If you can't breathe and your heart doesn't pump, do you want us to help you by using basic measures to keep your heart going and breathe for you?"
Jemiolo clarified that the foregoing discussion took place in "the context of keeping a person alive," as "CPR pertains to immediate measures" and "[i]t's not part of [her] practice to address life sustaining-measures. Only CPR." A Full Code order was cancelled upon the patient's discharge, which was the standard practice so that patients could change their basic directions depending on their medical condition at the time.
Christine Wilkins (Ph.D., M.S.W. and NYU's Advance Care Planning Program Manager) testified about her efforts to investigate palliative care for M.G. She contacted M.G.'s community residence and learned that he did not have any advance directives in place and had had no discussions about advance directives. The community residence caretakers informed Wilkins that, before M.G. was admitted to NYU, he had been his own guardian and had been able to make his own health care decisions. The community caretakers told Wilkins that M.G. had a cousin, Rachel Osher, who lived in Chicago and kept in touch with him. Wilkins spoke with Osher and learned that she had never spoken to M.G. about his wishes regarding life-sustaining treatment. Wilkins, who had made these types of inquiries hundreds of times, stated that it was not unusual for a family member not to have discussed such treatment with a patient, because it "is typically a very difficult conversation to have." MHLS did not produce any witnesses or present any other evidence following Wilkins's testimony.
Supreme Court granted Dr. Sloane's application to the extent of authorizing him and other physicians, nursing staff, and designated employees and agents to withdraw life-sustaining treatment from M.G., in accordance with Osher's decision and Dr. Sloane's directives. At the [*5]same time, the court rejected MHLS's claim that treating M.G., a developmentally disabled person with prior health care decision capacity, differently from a previously competent, non-disabled person violated his equal protection rights.
Discussion

At the outset, we note that the alleged Equal Protection violation is now academic, since M.G. died within hours of the termination of his life-sustaining treatment. However, given that intellectually and developmentally disabled persons have varying capacity, this issue will likely recur and will otherwise evade appellate review due to the likelihood of intervening deaths pending appeals involving the withdrawal (or withholding) of life-sustaining treatment. Under similar circumstances, courts have held that an exception to the mootness doctrine applies to appeals regarding end-of-life issues (see e.g. Matter of M.B., 6 NY3d 437, 447 [2006]; Matter of Storar, 52 NY2d 363, 369-370 [1981], cert denied 454 US 858 [1981]).
As indicated, the decision to withdraw M.G.'s life-sustaining treatment was made pursuant to SCPA 1750-b, which sets the terms for end-of-life decision-making for people with intellectual and developmental disabilities. In contrast, if M.G. had not had an intellectual or developmental disability, the decision whether to withdraw life support would have been made pursuant to article 29-CC of the Public Health Law, known as the Family Health Care Decisions Act (FHCDA). MHLS argues that, as applied to M.G., a person with a developmental disability who had capacity to make his own health care decisions until a heart attack at age 80, New York's law governing the withdrawal of life-sustaining treatment for people with intellectual and developmental disabilities violates the Equal Protection Clauses of the Federal and State constitutions. MHLS argues that M.G.'s classification as a developmentally disabled person denied him a meaningful inquiry into his end-of-life wishes, an inquiry that would be available to a non-disabled person with the "same prior decision-making capacity," under Public Health Law article 29-CC.
After reviewing the origins of the pertinent statute, as well as the new procedures it created, we conclude that, consistent with our holding in Matter of Chantel Nicole R. (34 AD3d 99 [1st Dept 2006]), treating M.G., a person with a developmental disability who had capacity to make his own health care decisions until his catastrophic illness, differently from a previously competent, non-disabled person does not violate the Equal Protection Clause. As explained below, contrary to MHLS's Equal Protection arguments, the legislature, in promulgating SCPA-1750-b, did not intend to situate intellectually and developmentally disabled persons who had previous health care decision-making capabilities similarly to non-disabled persons who were fully competent before their catastrophic illness. Nor does the best interests standard of SCPA 1750-b eliminate consideration of the wishes of intellectually and developmentally disabled persons in circumstances in which they had some capacity to make health care decisions.
 The Origins of the Health Care Decisions Act for
Persons with Mental Retardation (HCDA)
The HCDA was designed to address the legal dichotomy that the Court of Appeals first highlighted in 1981 in a pair of cases consolidated on appeal titled Matter of Storar and Matter of Eichner (52 NY2d 363 [1981], cert denied 454 US 858 [1981]). In both cases, "the guardians of incompetent patients objected to the continued use of medical treatments or measures to prolong the lives of the patients who were diagnosed as fatally ill with no reasonable chance of recovery" (52 NY2d at 369-370). In Matter of Eichner, Brother Fox, an 83-year-old member of the Society of Mary, was being maintained by a respirator in a permanent vegetative state (id.). Based on statements he had made while competent, "[t]he local director of the society applied to have the respirator removed on the ground that it was against the patient's wishes" to have his [*6]life sustained artificially when there was no hope of recovery (id.). In Matter of Storar, "a State official applied for permission to administer blood transfusions to a profoundly retarded 52-year-old man with terminal cancer of the bladder" (id.). The patient's mother, who was also his legal guardian, refused to provide consent on the ground that the transfusions would only prolong her son's discomfort and would be against his wishes if he were competent (id.).
In Eichner, the Court of Appeals allowed the guardian to discontinue respiratory support for Brother Fox, a patient who became incompetent due to illness but who had, before becoming incompetent, expressed the wish not to be kept in a vegetative state (id. at 371). Eichner was decided under the New York common-law principle that a competent adult generally has the right to make health care decisions, however rational or irrational, including the right to refuse life-sustaining treatment (see Matter of Fosmire v Nicoleau, 75 NY2d 218, 226-228 [1990]). If the individual suffers an illness or injury resulting in a loss of decision-making capacity, family and friends may obtain a court order authorizing the cessation of treatment if they can prove, by clear and convincing evidence of the patient's previously expressed views, that the individual would have refused life-sustaining treatment if capable of making that decision (see Matter of Westchester County Med. Ctr., ex rel O'Connor, 72 NY2d 517, 529 [1988]).
In contrast, in Storar, the Court of Appeals refused to allow the guardian of the terminally ill and profoundly retarded cancer patient to discontinue life-prolonging blood transfusions. The Court reasoned that there was no proof as to the patient's wishes since he had never been capable of making a reasoned decision about medical treatment (52 NY2d at 380). Although a guardian of a mentally retarded person was imbued under the common law with the authority to make a broad spectrum of health care decisions, this authority did not encompass the power to end life-sustaining medical treatment {id. at 381). Viewing the mentally retarded man as comparable to a child and the guardian's role as comparable to that of a parent, who may not deprive a child of life-saving treatment, the Storar Court concluded that the guardian of the 52-year-old mentally retarded man lacked the authority to order the cessation of blood transfusions (id. at 382). However, because it predicated its analysis on principles developed under the common law, which constrained the Court to find as it did, the Court encouraged the legislature to establish procedures governing the discontinuance of life-sustaining treatment for incompetent individuals, if it determined that this was desirable or appropriate (id. at 382-383).
The Statutory Scheme for Persons with Intellectual and Developmental Disability
In 2002, 20 years after Storar, the legislature took on the issue of mentally retarded disabled persons who never had the competence to indicate a choice with regard to withholding or withdrawing life-sustaining treatment [FN7]. In enacting the Health Care Decisions Act for Persons with Mental Retardation (HCDA) (L 2002, ch 500, S. 3), the legislature clarified that when it had been determined that a mentally retarded individual lacks the capacity to make health care decisions (see former SCPA 1750), the individual's duly appointed guardian "shall have the authority to make any and all health care decisions," including "any decision to consent or refuse [*7]to consent to health care" (former SCPA 1750-b[1], cross-referencing Public Health Law § 2980[6]). All such decisions must be based "solely and exclusively on the best interests of the mentally retarded person and, when reasonably known or ascertainable with reasonable diligence, on the mentally retarded person's wishes, including moral and religious beliefs" (former SCPA 1750-b[2][a]). The factors that must be considered in determining the mentally retarded person's best interests, include "the dignity and uniqueness of every person; "the preservation, improvement or restoration of the . . . person's health"; "the relief of the . . . person's suffering by means of palliative care and pain management"; "the effect of treatment, including artificial nutrition and hydration, on the mentally retarded person; and the patient's overall medical condition" (former SCPA 1750-b[2][b]). A medical decision cannot be based on financial considerations or a failure to afford the mentally retarded individual the respect that would be afforded persons without mental retardation (former SCPA 1750-b[2][c]).
The statute further set forth a detailed procedure, intended to protect the mentally retarded person and prevent an improvident decision by a guardian, that must be followed before a guardian's decision to end life-sustaining treatment for the individual may be carried out (see Matter of M.B., 6 NY3d 437, 442-444 [2006]). The individual's attending physician and a concurring physician "must determine to a reasonable degree of medical certainty and note on the mentally retarded person's chart" that the person has one of three conditions (a terminal condition, permanent unconsciousness, or "a medical condition other than such person's mental retardation which requires life-sustaining treatment, is irreversible and which will continue indefinitely"), and that "the life-sustaining treatment would impose an extraordinary burden on such person" (former SCPA 1750-b[4][b]).
In enacting the HCDA, the legislature interpreted Storar as holding that, since mentally retarded persons never had the mental capacity to choose to withhold or withdraw life-sustaining treatment, their guardians could not be granted the authority to make such decisions for them (see Memo in Support, L 2003 at 2003-2004). The HCDA was enacted to remedy this gap in the common law. "The purpose of this bill is to explicitly provide guardians of mentally retarded persons with the authority to make health care decisions for such persons, including decisions regarding life- sustaining treatment under certain circumstances" (Sponsor's Memo, 2002 NY Legis Ann, at 279-280). In 2005, the legislature added a provision affording guardians of developmentally disabled persons the same end-of-life decision-making authority that guardian's of intellectually disabled persons had (L 2005 at 1740-1741).
The Statutory Scheme for Competent Persons Rendered Incompetent by Catastrophic Event
A different statutory scheme governs end-of-life determinations for patients who were not intellectually or developmentally disabled before their catastrophic illness. In 2010, the legislature enacted FHCDA, at article 29-CC of the Public Health Law, in order to allow competent adults who lose decision-making capacity due to catastrophic illnesses to control their medical treatment (L 2010, ch 8). Pursuant to Public Health Law § 2994-d, the Surrogate must make health care decisions:
"(i) in accordance with the patient=s wishes, including the patient's religious and moral beliefs; or"(ii) if the patient's wishes are not reasonably known and cannot with reasonable diligence be ascertained, in accordance with the patient's best interests. An assessment of the patient's best interests shall include: consideration of the dignity and uniqueness of every person; the possibility and extent of preserving the patient's life; the preservation, improvement or restoration of the patient=s health or [*8]functioning; the relief of the patient=s suffering; and any medical condition and such other concerns and values as a reasonable person in the patient's circumstances would wish to consider" (Public Health Law § 2994-d[4][a] [emphasis added]).
Public Health Law § 2994-d provides that "[i]n all cases, the surrogate's assessment of the patient's wishes and best interests shall be patient-centered; health care decisions shall be made on an individualized basis . . . and consistent with the values of the patient, including . . . religious and moral beliefs, to the extent reasonably possible" (Public Health Law § 2994-d[4][b] [emphasis added]).
Analysis of the Equal Protection Claim
The Equal Protection Clause prohibits the government from treating people differently from others who are similarly situated (City of Cleburne v Cleburne Living Ctr., 473 US 432, 446-447 [1985]). Because mentally disabled persons are not similarly situated to persons who were once competent, the government need not treat them the same (id.). When the government treats mentally disabled persons differently from non-mentally disabled members of society, its action need only be rationally related to a legitimate government interest to pass constitutional muster (id. at 446-448).
As the history of the HCDA set forth above demonstrates, the State attempted to balance and advance the competing interests of preserving life, on the one hand, and not prolonging suffering, on the other, for intellectually and developmentally disabled persons. In that vein, the inequity the statute intended to redress was not in equating the competency of mentally-disabled persons to that of competent persons, but the fact that the guardians of intellectually and developmentally disabled persons were not allowed to make end-of-life health care decisions that competent persons could make for themselves. The legislature recognized that a different approach was needed and that special procedures were required to afford intellectually and developmentally disabled persons the same rights under the law as competent persons.
MHLS does not contend that these are not legitimate state interests. Rather, it argues that, in balancing these goals, there is no rational relation between treating intellectually and developmentally disabled persons who had some capacity to make their own health care decisions differently than once competent, non-disabled persons. It is this difference, MHLS claims, that violates the Equal Protection Clause. We disagree.
As indicated, the legislature promulgated a twofold approach to competent, non-disabled individuals. Under Public Health Law § 2994-d(4)(a)(i), the guardian's health care decision for the incapacitated person must be "in accordance with the patient's wishes, including the patient's religious and moral beliefs." The guardian must give effect to the incapacitated person's previously known competent wishes (commonly referred to as substituted judgment [FN8]) and past [*9]values and preferences. If the patient's wishes are not reasonably known and cannot with reasonable diligence be ascertained, the guardian's decisions regarding health care for the incapacitated person must be in accordance with the patient's best interests (Public Health Law § 2994-d[4][a][ii]).
In the instant case, MHLS does not claim any equal protection violation due to Public Health Law § 2994-d's threshold mandate that any end-of-life decision for once competent patients be determined on the basis of the wishes expressed by the person while competent. However, this approach is not available for intellectually or developmentally disabled people under Section 1750-b. As indicated, the different treatment derives from the common law, as highlighted in Storar (52 NY2d 363). Competent persons are presumed capable of communicating their wishes regarding end-of-life medical decisions through advance directives, stating their preferences to others, or by designating a health care proxy to make decisions for them. Even if they become incompetent, under Public Health Law § 2994-d, their preferences should be honored. As consistently held by the Court of Appeals, living wills and other written or oral evidence of treatment wishes will provide the basis for withdrawing or withholding life-sustaining measures if the instructions qualify as clear and convincing evidence of the patient's wishes (see e.g. Matter of Storar, 52 NY2d at 368; Westchester County Med. Ctr., 72 NY2d at 529-530 [1988]). But persons whose competence never rose to the level required for informed consent are in a different legal position.
MHLS, however, argues that the decision to terminate life support pursuant to SCPA's 1750-b's best interests standard violated M.G.'s equal protection rights by denying him, a developmentally disabled person who once had the capacity to make health care decisions, the same meaningful inquiry into his end-of-life wishes that a similarly situated non-disabled person would have received under the best interests analysis pursuant to article 29-CC of the Public Health Law. In our view, however, any perceived disparity in the treatment of an intellectually or developmentally disabled person who formerly had some capacity to make health care decisions and the treatment of non-disabled persons is rational. The legislature has made the policy decision that while some intellectually and developmentally disabled persons may be higher-functioning than others, only mentally competent, non-disabled individuals have the full capacity to appreciate the consequences of the decision to end their life and, thus, that intellectually and developmentally disabled persons are not similarly situated to those who were once competent and may be treated differently with respect to an end-of-life decision. Such disparate treatment furthers a legitimate state interest.
Our holding here is consistent with our decision in Matter of Chantel Nicole R. (34 AD3d 99), in which, over the daughter's objection, we upheld a mother's guardianship of her mentally-retarded 26-year-old daughter, who had an IQ of 52 and was functionally independent in the area of self-care, but was found to be incapable of considering end-of-life questions, even in the abstract. MHLS argued that mentally retarded persons were denied equal protection when they were deprived of the common law right to personal autonomy had by competent adults who, while competent, articulated life-ending decisions, to which a guardian was required to adhere pursuant to Public Health Law § 2994-d (34 AD3d at 101-102). This Court rejected the contention that SCPA 1750-b violated the patient's equal protection rights by treating mentally retarded persons differently from those who were once competent, finding that "any disparity in treatment of a mentally retarded person is justified by legitimate state interests, that respondent has been accorded due process and is not aggrieved on such grounds" (id. at 103 [emphasis [*10]added]). This Court reasoned:
"The Surrogate properly concluded that a mentally retarded person's expression of a desire to continue life-sustaining measures is categorically distinguishable from the same desire expressed by a mentally competent individual because only the latter has the capacity to appreciate the consequences of the decision and thus the ability to make the choice to pursue an uninformed or irrational alternative . . . . The Equal Protection Clause only prohibits the government from treating persons differently from others who are similarly situated, and mentally retarded persons are not similarly situated to those who were once competent. The difference in treatment of discrete groups need only be rationally related to a legitimate government interest in order to pass constitutional muster (Cleburne v Cleburne Living Center, Inc., 473 US 432, 446-448 [1985]), and retarded persons are appropriately treated differently when disparate treatment furthers a legitimate state interest and has a rational basis (see Heller v Doe, 509 US 312, 320-321 [1993])" (34 AD3d at 104-105).
MHLS, however, argues that Matter of Chantel Nicole R. has been implicitly overruled by the Court of Appeals. On the contrary, in Matter of M.B. (6 NY3d 437), the Court of Appeals explicitly rejected MHLS's current argument that because intellectually and developmentally disabled persons may have had health care decision-making capacity before their catastrophic illnesses, they may be situated similarly to other non-disabled people who previously had health care decision-making capacity (id. at 448).[FN9]
In Matter of M.B., the guardian was appointed before the HCDA's effective date. The ward's physicians concluded that his illness was terminal and that his life-sustaining treatment substantially burdened him. MHLS objected to the guardian's request to disconnect the ward's respirator (id. at 449). MHLS agreed that stopping life-sustaining treatment was in the ward's best interests and was satisfied that the guardian had complied with all of the procedural and substantive safeguards required under the HCDA (id. at 450). Nevertheless, it argued that a guardian appointed before the HCDA's effective date needed to petition the court before he or she could request termination of life-sustaining treatment under the new procedures set forth in SCPA 1750-b (id.).
Under the HCDA, newly appointed guardians must address the health care capacity issue twice, once when initially appointed and again when making end-of-life decisions. Previously appointed guardians addressed the issue only when making a specific decision to end life-sustaining treatment. In Matter of M.B., the Court of Appeals observed that the legislature had determined that it would serve no significant purpose to require each previously appointed guardian to commence proceedings "for the expansion of health care decision-making authority," given the procedural steps all guardians must follow under SCPA 1750-b, which include an inquiry into the intellectually or developmentally disabled person's capacity to make health care decisions (id. at 452-453).
MHLS argued that the common law inquiry was not equivalent to the guardianship certification process contemplated under the amended SCPA 1750-b because it occurred after the [*11]mentally retarded person was in medical crisis and therefore failed to adequately account for the possibility that the patient might once have had the capacity to make health care decisions (id. at 453). The Court of Appeals, however, found that MHLS's concerns were misguided because "whether judicial intervention is sought in the context of a guardianship expansion proceeding or a SCPA 1750-b objection, the court must render a determination based on the present capacity of the mentally retarded person  not abilities the patient may have once possessed" (id.). In addition, the Court noted, in circumstances in which the intellectually or developmentally disabled person formerly had some capacity to make medical decisions, the guardian is nonetheless required to base medical decision-making "on the best interests of the mentally retarded person and, when reasonably known or ascertainable with reasonable diligence, on the mentally retarded person's wishes, including moral and religious beliefs" (Matter of M.B. 6 NY3d at 459, quoting former SCPA 1750-b[2][a]). Thus, as the Court of Appeals recognized, "the wishes of an intellectually or developmentally disabled individual who once had capacity to make health care decisions are not disregarded under the new statutory scheme" (id. at 454).
As alluded to by the Court of Appeals in Matter of M.B., MHLS's equal protection argument incorrectly assumes that SCPA 1750-b's best interests standard is entirely separate from and independent of a mentally disabled person's wishes. While the best interests analysis is still paramount under SCPA 1750-b, the legislature made a policy decision that not all intellectually and developmentally disabled persons should be treated the same by enumerating factors to be applied in determining best interest that allow the uniqueness of each disabled person to be taken into consideration and require consideration of the intellectually and developmentally disabled person's wishes.[FN10]
Indeed, best interests under the statute is an assessment of the benefits and burdens of the end-of-life decision performed by taking into account the enumerated factors, including "the preservation, improvement or restoration of the person['s] health" and "resumption or restoration of functions," as well as "the relief of the person['s] suffering" (SCPA 1750-b[2][b]). However, importantly, SCPA 1750-b explicitly includes an additional layer of consideration of the person's "wishes," including "moral and religious beliefs." The legislature made the policy choice that the intellectually and developmentally disabled person's expressed interests are not to be ignored just because those expressions do not rise to the level of competence for informed consent [FN11]. The [*12]legislature recognized that the strict benefit and burden analysis dehumanizes patients by suggesting that only their present condition counts and thus ignores the "dignity and uniqueness of every person" (SCPA 1750-b[2][b]). Thus, SCPA's 1750-b best interests model explicitly encourages guardians to respect, to the greatest degree possible, the "dignity and uniqueness" of each person, reincorporating the beliefs and personality traits of the persons in life-sustaining decisions.
Under the circumstances, under SCPA 1750-b, the determination of the functional capacity of the intellectually or developmentally disabled person is a necessary inquiry in the best interests analysis. Of course, as for those intellectually and developmentally disabled persons with severe conditions, their mental capacity may be so diminished that they either cannot understand or cannot deliberate about health care decisions, particularly life-and-death decisions. For them, the benefit and burden analysis may be confined to their immediate well-being. But for those who, like M.B., had some health care decision-making capacity, the analysis for determining end-of-life decisions includes their values and wishes.
Accordingly, the patient's subjective preferences are not ignored in SCPA 1750-b's best interests analysis. The patient's right to "uniqueness and dignity" is not diminished if the patient is intellectually or developmentally incompetent. A guardian should examine the patient's subjective preferences and values in performing the obligation to promote the patient's well-being. The values and preferences of the patients serve as a guide to a best interests judgment. Of course, in certain circumstances, a guardian may override an expressed preference, for example, where there is clear evidence that the preference is irrational or destructive (that no rational person would have made such a determination). Ultimately, the reasonableness of a guardian's choice to stop or continue treatment should be evaluated by considering the patient as a whole, including his or her values, physical and emotional interests, and ability to experience and enjoy life, so as to assure that intellectually and developmentally disabled persons are provided the right to die with the comfort and dignity that others cherish.[FN12]
Applying the considerations discussed above to the facts before us, we are satisfied that Supreme Court's decision with regard to M.G. was consistent with SCPA 1750-b's requirements for withdrawal of life-sustaining treatment. The undisputed medical evidence establishes that before his demise, M.G. was in a permanent vegetative state; he suffered from multiple organ failure of the lungs, kidneys, and brain. M.G. had no neurologic function and did not respond to stimuli or breathe without a ventilator. The medical expert's opinion was that the need for hemodialysis, the chest tubes, and ventilation were ongoing, that M.G.'s lack of cognitive ability could not be cured, and that there was no chance of meaningful neurological recovery. It was thus abundantly clear that M.G. was completely unable to interact with his environment, and that the medical probability that he would ever return to a cognitive sentient state, as distinguished from a chronic vegetative existence, was virtually non-existent. Any medical treatment administered would have provided minimal, if any, benefit and would only have postponed M.B.'s death rather than improve his life. In short, M.G.'s condition was irreversible, and treatment would have imposed an extraordinary burden on him (see SCPA 1750-b [4][b][i]; see also Matter of Elizabeth M., 30 AD3d 780, 783-784 [3d Dept 2006]). The best interests of the patient under SCPA 1750-b embraces not only recovery or the avoidance of pain but also a dignified death. The guardian's decision conformed with the obligation to promote the patient's well-being, and to the extent possible, the decision of M.G. himself.
Finally, we reject MHLS's argument that Supreme Court made no effort to "investigate M.G.'s wishes and values more thoroughly before resorting solely to his perceived best interests." Contrary to MHLS's contentions, the problem was not that the court did not focus on the expressed preferences of the patient. There was a lack of evidence of what his desires would have been had he contemplated the catastrophic injury that later befell him. There was no evidence that conversations were had with him about his feelings or opinions about the withdrawal of life-sustaining treatment, and he did not execute any advance directives expressing his wishes. Nevertheless, we recognize that in promulgating SCPA 1750—b, the legislature intended the best interests standard to be a "patient-centered" approach. This requires the courts to explicitly deal with a patient's expressed preferences and wishes in conducting a best interests analysis.
Accordingly, the order of Supreme Court, New York County (Nancy M. Bannon, J.), entered on or about December 27, 2016, which, among other things, after a hearing, granted petitioner's application for authorization to withdraw life-sustaining treatment from respondent M.G., and denied Mental Hygiene Legal Service's objection to the decision of the guardian to withdraw life-sustaining treatment, should be affirmed without costs.
All concur except Tom, J. who concurs in a separate Opinion.




TOM, J. (concurring)


While I agree with the result reached by the majority, I write separately because I believe we should take this occasion to discuss the meaningful inquiry into end-of-life wishes that a person with developmental disabilities should be afforded under SCPA 1750-b and to clarify that [*13]the mandates of the statute need to be strictly adhered to in order that the person's best interests, including his or her known wishes, are met.
I agree with the majority's opinion that the application of SCPA 1750-b's "best interests" standard for a person who is intellectually disabled (SCPA 1750-b[2]), rather than the standard that applies under article 29-CC of the Public Health Law to a similarly situated non-disabled person (see Public Health Law § 2994-d[4]), did not violate M.G.'s equal protection rights (US Const, 14th Amend, § 1). Indeed, this Court has previously recognized that "a mentally retarded person's expression of a desire to continue life-sustaining measures is categorically distinguishable from the same desire expressed by a mentally competent individual . . . and [that] mentally retarded persons are not similarly situated to those who were once competent" (Matter of Chantel Nicole R., 34 AD3d 99, 104-105 [1st Dept 2006], appeal dismissed 8 NY3d 840 [2007]).
However, the Court of Appeals has held that under SCPA 1750-b,
"in circumstances where the mentally retarded person formerly had some capacity to make medical decisions, the guardian is nonetheless required to base medical decision-making on the best interests of the mentally retarded person and, when reasonably known or ascertainable with reasonable diligence, on the mentally retarded person's wishes, including moral and religious beliefs' (SCPA 1750-b[2][a]). Thus, the wishes of a mentally retarded individual who once had capacity to make health care decisions are not disregarded under the new statutory scheme" (Matter of M.B., 6 NY3d 437, 454 [2006]).
In other words, a guardian under SCPA 1750-b is obligated to attempt to ascertain, with reasonable diligence, the mentally retarded person's wishes regarding end-of-life treatment, including moral and religious beliefs. The guardian then makes his or her healthcare decision by considering the best interests of the person by looking at, inter alia, the dignity and uniqueness of every person; the preservation, improvement or restoration of the health of the intellectually disabled person; the relief of the suffering of the intellectually disabled person by means of palliative care and pain management; the unique nature of artificially provided nutrition or hydration, and the effect it may have on the intellectually disabled person; and the entire medical condition of the person. The person's wishes, to the extent they are known or reasonably ascertainable, must also be considered by the guardian as part of the analysis.
The undisputed medical evidence at the hearing established that M.G. was in a permanent vegetative state, suffered from multiple organ failure, and had no neurologic function, that there was no chance of meaningful neurological recovery, and that there was essentially no probability that he would return to a cognitively aware state. The evidence also showed that any medical treatment would have provided minimal benefit at best, and would not have improved M.G.'s life. I agree with the majority that the best interests of the patient embraces the idea of a dignified death.
However, the only testimony regarding M.G.'s wishes came from the medical personnel at NYU; the guardian, Rachel Osher (M.G.'s cousin), did not appear or submit any evidence to the court. Dr. Sloane advised the court that Osher, who lives in Chicago, gave her hearsay oral approval for the withdrawal of life-sustaining treatment. Dr. Sloane also testified that a few days before M.G. entered a vegetative state, he had appeared at the hospital, and was deemed competent to make a decision about resuscitation and CPR in the event his heart stopped or he could not breathe.
Ursula Jemiolo, a physician's assistant, testified that in accordance with M.G.'s wishes in the event of a cardiac or respiratory arrest she entered a "full code" in his record, which meant that basic measures would be used to keep his heart going and to breathe for him in the event his heart stopped or he could not breathe on his own. She clarified that this directive did not extend to life-sustaining treatment. Dr. Caspers similarly explained that the full code directive did not address the patient's wishes regarding life-sustaining treatment.
Regarding efforts to determine M.G.'s wishes, Christine Wilkins, NYU's Advance Care Planning Program Manager, testified that she contacted M.G.'s community residence and learned that he did not have any advance directives in place and had not had discussions concerning advance directives. The community residence caretakers informed Wilkins that, before he was admitted to NYU, M.G. had been his own guardian, able to make his own health care decisions. Wilkins also spoke with Osher, and learned that the guardian had never spoken to M.G. about his wishes regarding life-sustaining treatment. M.G., represented by MHLS, did not present any evidence.
The lack of direct evidence from the guardian is particularly concerning because SCPA 1750-b obligates the guardian to base healthcare decisions on the best interests of the intellectually disabled person, including consideration of the person's wishes "when reasonably known or ascertainable with reasonable diligence." Where, as here, a special proceeding is commenced to authorize the guardian to withdraw life-sustaining treatment, this standard must require that the guardian directly advise the court of the factors that were considered in the best interests analysis, the person's wishes, or the efforts made to ascertain the person's wishes, and, to the extent wishes were ascertained, their impact on the best interests analysis.
Although the court may have considered the evidence regarding M.G.'s wishes presented by NYU's medical staff, it had no such evidence from the guardian. Although it is a moot issue in this case, I believe that, just as we considered the equal protection claim as an exception to the mootness doctrine, we need to ensure that the guardian strictly complies with the provisions of SCPA 1750-b and that the best interests of the person (and where expressible, his or her wishes) are met. The procedure of SCPA 1750-b was not followed in this proceeding. It is not even known whether the guardian in this case knew of M.G.'s request for a full code only three days before he suffered a cardiac arrest with anoxic brain injury and went into a coma. M.G.'s request for a full code days before he became unconscious may have a significant relevance to or bearing on his wishes regarding life-sustaining treatment.
Therefore, I would hold that in order to establish that a guardian has complied with the obligations and decision-making standard under SCPA 1750-b, he or she must comply with the mandates of the SCPA 1750-b and inform the court of the factors that were considered in the best interests analysis, the person's wishes, or the efforts made to ascertain the person's wishes, and, to the extent wishes were ascertained, their impact on the best interests analysis. In this way, the court will be best positioned to determine whether the guardian met the requirements of the statute and whether or not the withdrawal or withholding of life-sustaining treatment is in accord with the criteria set forth in the statute.
Order, Supreme Court, New York County (Nancy M. Bannon, J.), entered on or about December 27, 2016, affirmed, without costs.
Opinion by Renwick, J. All concur except Tom, J. who concurs in a separate Opinion.
Sweeny, J.P., Renwick, Tom, Mazzarelli, Oing, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: AUGUST 16, 2018
CLERK



Footnotes

Footnote 1: "[L]ife sustaining treatment means medical treatment which is sustaining life functions and without which, according to reasonable medical judgment, that patient will die within a relatively short time period" (Mental Hygiene Law § 81.03(j)).

Footnote 2: " Capacity to make health care decisions' means the ability to understand and appreciate the nature and consequences of health care decisions, including the benefits and risks of and alternatives to any proposed health care, and to reach an informed decision" (Public Health Law § 2980[3]).

Footnote 3: A "previously competent, non-disabled person" refers to one rendered incompetent by a catastrophic illness or accident. Throughout this opinion the terms "once competent" and "previously competent person," are used interchangeably.

Footnote 4: Bilateral tubes were also inserted into his chest, due to collapsed lungs, nasogatric tube was inserted into his nasal passages for nutrition and hydration, and he required dialysis.

Footnote 5: Osher was appointed M.G.'s guardian after he became permanently vegetative.

Footnote 6: Under SCPA 1750-b(4)(b)(ii)'s "extraordinary burden" standard, the guardian must ascertain the burden of continued treatment and the likelihood of recovery in the event of medical intervention.

Footnote 7: In 2016, the term "persons who are intellectually disabled" was substituted for the term "mentally retarded
persons" throughout article 17-a (L 2016, ch. 198, effective July 21, 2016). In addition, throughout the SCPA, references to "mentally retarded" persons were changed to "intellectually disabled" persons (id).

Footnote 8: Under the substituted judgment standard, the Surrogate's task is to reconstruct what the patient himself would want if he had decision-making capacity (see Superintendent of Belchertown State Sch. v. Saikewicz, 370 NE2d 417, 430-31 (Mass. 1977). The principle underlying this legal standard is the respect for autonomy; when a patient is not capable of making a decision for himself, we can nonetheless respect his autonomy by reconstructing, as best we can, the autonomous decision he would make if he were capable of making a decision. (id. see also Matter of L.H.R., 321 SE2d 716, 722-23 [Ga. 1984]; Matter of conservatorship of Torres, 357 NW2d 332, 341 [Minn. 1984]; Matter of Guardianship of Ingram, 689 P2d 1363, 1372 [Wash. 1984]).

Footnote 9: Matter of M.B. addressed the question of whether intellectually and developmentally disabled people were similarly situated to non-disabled people in the context of deciding whether SCPA 1750-b's provision of end-of-life decision making authority applied retroactively to previously appointed guardians.

Footnote 10: Under the common law's traditional best interests analysis, treatment may be withdrawn where the burdens of treatment clearly outweigh any benefit to the patient. The traditional best interests analysis involves straightforward, rigid consideration of the current condition of the patient and the effects of the decision to withdraw life-sustaining treatment (see James F. Drane & John L. Coulehan, The Best-Interests Standard: Surrogate Decision Making and Quality of Life, 6 J. Clinical Ethics 20, 28-29 [1995]; Dennis Mazur & David Hickam, Patient Preferences: Survival vs. Quality of Life Considerations, 8 J. Gen. Int. Med. 374 [1993]). This approach is consistent with the traditional notion of a guardian=s responsibility toward helpless wards and the state=s parens patriae relation to incompetent persons (see e.g. Matter of Grady, 426 A2d 467, 481-483 [NJ 2002]).

Footnote 11: See 2002 NY Legis Ann at 279; 2002 McKinney's Session Laws of NY, at 2002 - 2004); Budget Report, Bill Jacket, L 2002, ch 500 at 4; Memo from Dennis P. Whalen, Executive Deputy Commissioner State Department of Health, id. 8; Letter from Patricia W. Johnson, Counsel Assistant, State Commission on Quality of Care for the Mentally Disabled, id.; Letter from Mac N. Brandt, executive Director, id. at 16.).

Footnote 12: Under SCPA 1750-b, the best-interest analysis is not conducted solely from the subjective point of view of the patient or the guardian, but is an inquiry into the value that the continuation of life has for the patient. The hope is to implement the patient's likely choice by having the guardian choose for the patient by weighing the precise elements of best interests as defined by the legislature, applying them in the fashion (i.e., according to the weighing) that an average person would want (see New York State Task Force on Life and the Law, When Others Must Choose: Deciding for Patients Without Capacity 74-75 [1992]; President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment 132-34 [1983]; President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Making Health Care Decisions 178-79 [1982]). Thus, consistent with the legislative mandate that intellectually and developmentally disabled persons have the right to be treated with human dignity, the assumption is made that the person would prefer to be treated as the average human being would want to be treated (see Matter of Doe, 53 Misc 3d 829, 856 ([Sup Ct Kings County 2016]).